## S94P1617. BRIGHT v. THE STATE.
(455 SE2d 37)

SEARS, Justice.

The appellant, Kenneth Bright, was convicted of the murder of his two grandparents and of possession of a controlled substance. The jury sentenced Bright to death for the murders, and the trial court

sentenced Bright to 15 years in prison on the possession offense.[1] For the reasons that follow, we affirm Bright's convictions but reverse his sentence of death.

1. The evidence would have authorized a rational trier of fact to conclude that Bright stabbed his grandmother twenty-one times, with the fatal wound being a stab wound directly into the heart sac, and that Bright stabbed his grandfather twelve times, with the most severe and probably fatal wound being a stab wound that fractured the tenth and eleventh ribs causing the ribs to tear the spleen. The evidence was sufficient to satisfy *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his first enumeration of error, Bright contends that the trial court erred by failing to provide him independent expert assistance at state expense for purposes of preparing his defenses at the guilt and punishment phases of the trial. We find no error as to the guilt phase of the trial, but find that Bright made the required threshold showing to obtain assistance at the punishment phase. We therefore reverse Bright's death sentence.

(a) Before trial the defense filed a motion requesting funds from the trial court to obtain expert assistance to evaluate Bright's mental health at the time of the offense, to assist the defense in preparing for trial, and to assist in investigating and presenting evidence in mitigation at the penalty phase.

Bright attached records showing that in February 1989 he had been a patient at the Columbus Department of Mental Health and Substance Abuse. These records show that Bright sought treatment as a result of his depression, use of crack cocaine, and suicidal thoughts stemming from depression about past actions; that Bright had completed high school and had an average ability to read and write; that although Bright was depressed about past actions, expressed suicidal plans, and had poor impulse control, he had no perceptual disturbances (i.e., no "hallucinations," no "illusions," and no "depersonalization and derealization of ideas"); that he had appropriate continuity of thought and no language impairment; that his be-

---

[1] The crimes occurred on October 30, 1989. Bright was indicted February 5, 1990. Bright was tried on July 9-12, 1990. The jury found Bright guilty on July 12 and that same day recommended that he receive the death penalty. Bright filed a motion for new trial on August 9, 1990. The court reporter certified the trial transcript on September 4, 1990. Bright amended his motion for new trial on October 17, 1990. On August 12, 1991, Bright filed a motion seeking to disqualify the judge who tried the case from presiding over the motion for new trial hearings. On September 18, 1991, a new judge was appointed to hear the motion to disqualify. On December 10, 1991, Bright amended his motion for new trial again. On August 27, 1992, the trial judge appointed to hear the motion to disqualify denied that motion. The original trial judge then held a hearing on the motion for new trial on August 27, and October 21, 1993. The trial court denied the motion for new trial on May 6, 1994, and Bright filed his notice of appeal on June 6, 1994. The case was orally argued on November 7, 1994.

havior was appropriate for the situation; that his memory was good; and that he was aware of his substance abuse and verbalized his need for help. On a form used to evaluate a patient's level of need of treatment for mental illness, mental retardation, or dependency on alcohol or drugs, the clinical worker who evaluated Bright did not list any level of need for mental illness or mental retardation but listed Bright as a patient most-in-need of treatment for cocaine abuse. This classification meant that the substance abuse had caused Bright "social, emotional, developmental, and/or physical disabilities"; that Bright would be "unable to function" without "state supported services"; that he had a long history of dysfunction; that he needed long term treatment; and that he presented a "[s]ubstantial risk of harm to self or others." Bright was treated by social workers and prescribed an anti-depressant drug by a physician.

In support of his motion for funds, Bright also submitted the medical records of the Muscogee County Jail following his booking for the murder of his grandparents. The report indicates that Bright was biting his fingers until they bled; that he was coming off crack cocaine; and that he might need referral to a local psychiatric institute.

Bright further attached to his motion a copy of a study published in the American Journal of Psychiatry that concluded that, of 15 death row inmates chosen for evaluation because of their impending execution dates and not because of evidence of "neuropsychopathology," all 15 had histories of severe head injuries and suffered from some forms of neurological and psychological dysfunctions that could have been significant for purposes of mitigation at their trials. By way of affidavit, Bright stated he had been hit in the head with a brick when he was eleven years old and still has a lump and a loss of hair from that injury; that he ran into a car when he was eight years old and injured his forehead and has a scar from that injury; and that he was hit by a baseball bat on his left eyebrow when he was twelve years old and has a scar from that injury as well. Bright contended that the study appearing in the American Journal of Psychiatry, coupled with the evidence of his head injuries, meant that he might have undiagnosed, unrecognized neurological problems.

Bright also attached copies of two statements he had made to police after the crimes. In both of those statements, Bright stated that he went to his grandparents' house to borrow $20 to buy some crack cocaine. His grandmother would not give him the money because she could tell he had been using drugs and drinking alcohol. Bright got nervous because his grandmother said she was going to call his mother and tell her of Bright's drug and alcohol use and that he was driving her car. Bright contended that when his grandmother started to call his mother, he lost control because of his intoxication and started stabbing his grandparents. In his first statement, Bright

concluded that "I'm not no killer. [T]hings just got out of hand. . . . Because of drugs I am guilty. I hope that this world can have mercy on me because I'm sorry."

Finally, Bright stated in an affidavit that his mother killed his father when he was six years old; that he was his father's favorite child; that Bright then went to live with his grandmother until his mother was cleared of charges; and that throughout his life his mother accused him of being just like his father. Bright alleged that he struggled with this accusation and dealt with it by taking drugs in junior high school. Bright further stated that he had no animosity toward his grandparents and had no understanding of how he could have killed them.

Bright contended in his motion that his only defense on the merits of the case was his mental condition at the time of the killings and that he would ask for a verdict of not guilty by reason of insanity or of guilty but mentally ill. Bright further contended that the foregoing factors demonstrated that at the death penalty phase of the trial he needed to present evidence as to his mental condition, mental history, drug abuse, his social history, and his neurological history as mitigating factors.[2] Bright contended that he needed expert assistance at the guilt and penalty phases of his trial to effectively defend his case.

In his motion, Bright named a neurologist who, according to Bright, was available to give Bright a neurological examination to investigate whether there was physical damage to Bright's brain and that his fee was $120 for a preliminary examination, $500 for a CT scan, and $200 for an EEG test. Bright also named a toxicologist who would be available to testify regarding the effect of crack cocaine on Bright's central nervous system and his mental condition and who would charge $400 to review records and $150 per hour to testify, with the testimony, including travel time, to take approximately six hours. Bright also listed the name of a clinical psychologist who, Bright stated, would conduct a full examination of Bright's mental condition for $640 and testify for $150 per hour, with the testimony to last about two hours. Finally, Bright stated that, without experts in the areas of neurology, psychology, and toxicology, he would not be able to present a defense at the guilt or punishment phases of the trial.

(b) Pursuant to *Brooks v. State*, 259 Ga. 562, 563-566 (2) (385 SE2d 81) (1989), a defendant who contends that he or she is entitled

---

[2] In this regard, Bright's motion specifically provided that:

Defendant further shows that in the mitigation phase of this death penalty trial he has the right to present evidence as to his mental condition, his mental history, his social history, his neurological condition, the fact that he was under the influence of drugs at the time of the occurrence, and any and all other mitigating factors which go to his ability to form intent, to realize the nature and consequences of his actions, his ability to control himself, and his ability to deal with reality.

to obtain expert assistance at public expense is entitled to have an ex parte hearing on the motion. The trial court held an ex parte hearing on Bright's motion on May 18, 1990. Immediately before the ex parte hearing, the trial court held a hearing pursuant to Uniform Superior Court Rules 31.4 and 31.5. Those rules require, among other things, that a defendant give a prosecutor notice of his intent to raise an insanity defense at trial, which Bright did in the instant case. In essence, as a result of the two hearings, the trial court required Bright to submit to an evaluation by a state employed psychiatrist pursuant to OCGA § 17-7-130.1[3] (hereinafter referred to as the "court expert" or "court psychiatrist"), but denied Bright's motion to obtain expert assistance at public expense. The court did, however, state that after the court psychiatrist's report came back, the court would consider whether that report contained any information indicating that Bright needed expert assistance at public expense. The court's written order pursuant to § 17-7-130.1 ordered the Department of Human Resources to conduct an examination of Bright and to provide to the court, to Bright's lawyer, and to the District Attorney a report regarding Bright's competency to stand trial and his mental capacity to distinguish between right and wrong at the time of the alleged crimes.[4]

Bright refused to cooperate with the court expert and never obtained expert assistance to assist him at trial.

(c) Bright contends that he made the required showing for funds to obtain expert assistance under *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985), and *Roseboro v. State*, 258 Ga. 39 (365 SE2d 115) (1988), and that the trial court erred by denying his motion.

We turn now to a discussion of the requirements of *Ake* and *Roseboro*. In *Ake*, the Supreme Court held that when a defendant

---

[3] Section 17-7-130.1 provides as follows:

At the trial of a criminal case in which the defendant intends to interpose the defense of insanity, evidence may be introduced to prove the defendant's sanity or insanity at the time at which he is alleged to have committed the offense charged in the indictment or information. When notice of an insanity defense is filed, the court shall appoint at least one psychiatrist or licensed psychologist to examine the defendant and to testify at the trial. This testimony shall follow the presentation of the evidence for the prosecution and for the defense, including testimony of any medical experts employed by the state or by the defense. The medical witnesses appointed by the court may be cross-examined by both the prosecution and the defense, and each side may introduce evidence in rebuttal to the testimony of such a medical witness.

See *Motes v. State*, 256 Ga. 831 (353 SE2d 348) (1987).

[4] For the reasons given in the following cases, we note that a trial court may not appoint as a defense expert under *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985) any expert that the court appoints and directs to report back to the prosecutor. *Starr v. Lockhart*, 23 F3d 1280, 1290-1291 (8th Cir. 1994); *Cowley v. Stricklin*, 929 F2d 640, 644 (11th Cir. 1991); *Smith v. McCormick*, 914 F2d 1153, 1157-1160 (9th Cir. 1990).

carries his burden to show that his sanity

> will be a significant factor at trial, the State must, at a mini-
> mum, assure the defendant access to a competent psychia-
> trist who will conduct an appropriate examination and assist
> in evaluation, preparation, and presentation of the defense.

*Ake*, 470 U. S. at 83. Although the Court in *Ake* stated that an indi-
gent defendant does not have a right to a psychiatrist of his own
choosing or to receive funds to hire his own, the Court made clear
that the state had to provide access to a psychiatrist that would sat-
isfy the purposes set forth in the opinion. Id. at 83. Those purposes
entail the psychiatrist's assistance in preparing all aspects of the de-
fense relating to the defendant's mental condition. The court also ex-
plained that the right to expert assistance applies, when appropriate,
to the sentencing phase of capital proceedings. Id. at 83-84. Accord
*Christenson v. State*, 261 Ga. 80, 83 (402 SE2d 41) (1991). Similarly,
*Ake* counsels that the appointment of neutral psychiatrists whom ei-
ther the state or the defense may question does not satisfy the re-
quirements of due process. Id. at 84-85.

In *Roseboro*, we held that

> [a] motion on behalf of an indigent criminal defendant for
> funds with which to obtain the services of a scientific expert
> should disclose to the trial court, with a reasonable degree of
> precision, why certain evidence is critical, what type of scien-
> tific testimony is needed, what that expert proposes to do
> regarding the evidence, and the anticipated costs for services.
> Lacking this information, a trial court will find it difficult to
> assess the need for assistance.

*Roseboro*, 258 Ga. at 41.

*Roseboro* dealt with a request for funds for non-psychiatric ex-
pert assistance. However, this Court, as well as the federal cases on
which this Court relied for our holding in *Roseboro*, has noted that
the requirements of *Roseboro* are a corollary of the due process prin-
ciples of *Ake*. *Tatum v. State*, 259 Ga. 284, 286 (380 SE2d 253)
(1989); *Moore v. Kemp*, 809 F2d 702, 717-718 (11th Cir. 1987) (en
banc), cert. denied, 481 U. S. 1054 (107 SC 2192, 95 LE2d 847) (1987);
*Little v. Armontrout*, 835 F2d 1240, 1243-1244 (8th Cir. 1987) (en
banc), cert. denied, 487 U. S. 1210 (108 SC 2857, 101 LE2d 894)
(1988). See also *Brooks*, 259 Ga. at 565.

(d) Before evaluating the merits of Bright's motion for expert as-
sistance under the foregoing standards, we address the state's conten-
tion that Bright's failure to cooperate with the court psychiatrist

waived his right to contend on appeal that the trial court erred by denying his motion. We find no merit to this position.

First, we note that § 17-7-130.1 deals only with an insanity defense and thus does not apply to Bright's motion for expert assistance for sentencing.

In addition, even if it did apply to sentencing, there is no authority for denying a defendant's motion for funds pursuant to *Ake* solely on the ground he did not cooperate with a court expert appointed under § 17-7-130.1. First, § 17-7-130.1 is simply inapplicable to an *Ake* motion for funds. *Ake* concerns whether a defendant is entitled to expert assistance at public expense to assist him in preparing his defense. To obtain that assistance, the defendant has the burden to make a preliminary showing that his sanity will be a significant issue at trial. On the other hand, § 17-7-130.1 is designed to give the state a fair opportunity at trial to counteract the defendant's expert testimony. See *Motes v. State*, 256 Ga. 831 (353 SE2d 348) (1987); *Estelle v. Smith*, 451 U. S. 454 (101 SC 1866, 68 LE2d 359) (1981). Thus, contrary to Justice Carley's assertion in his dissent, p. 289, § 17-7-130.1 is not designed to assist in making the preliminary determination "whether sanity will be a significant factor at trial."

Moreover, as *Ake* squarely places the burden on the defendant to make a preliminary showing that his sanity will be a significant factor at trial, the defendant has the concomitant right to meet that preliminary burden in any manner he chooses. The defendant may do so by presenting his own evidence that he believes meets his preliminary burden under *Ake*. On the other hand, the defendant may, if he chooses, submit to an examination by a court expert. If a defendant chooses to have his motion stand or fall on his own evidence, the trial court does not have the authority to deny his *Ake* motion solely on the ground that he did not submit to a court expert and without an evaluation of whether the defendant's own evidence met his preliminary burden. If, however, the trial court finds a defendant's evidence does not meet his preliminary burden, there is nothing to preclude the trial court from preliminarily denying the defendant's *Ake* motion, but informing the defendant that the court will further consider the *Ake* motion if the defendant cooperates with a court expert and that expert's report indicates the defendant's sanity will be a significant issue at trial.

Further, as *Ake* and *Brooks v. State*, 259 Ga. at 565, expressly provide that a hearing on a defendant's motion for expert assistance must, as a matter of due process, be conducted in secret, it is clear that trial courts may not condition a ruling on a defendant's *Ake* motion on the defendant's cooperation with a court expert appointed

pursuant to § 17-7-130.1.[5]

This conclusion is also supported by our decision in *Motes v. State*, 256 Ga. at 832-833, which concerns the effect of a defendant's filing of a notice of intent to raise a defense of insanity. In that case, this Court expressly held that "OCGA § 17-7-130.1 does not provide for sanctions against a defendant who refuses to cooperate with the court's expert." We next addressed the holding of *Estelle v. Smith*, 451 U. S., supra, "that a defendant who introduces expert psychiatric testimony in support of an insanity defense, waives his right to remain silent to the extent that he must make himself available to the state's psychiatric expert for examination." *Motes*, 256 Ga. at 832. We held "that *Estelle* in no way holds that the assertion of an insanity defense will result automatically in the absolute waiver of the right to remain silent." Id. Instead, we held that *Estelle* stands for the proposition that "if a defendant wants to introduce expert testimony," he must allow the state the same opportunity by cooperating with a state expert. *Motes*, 256 Ga. at 833. *Motes* thus stands for the propositions that § 17-7-130.1 does not provide for sanctions against a defendant who refuses to cooperate with a court expert, that the filing of a notice of intent does not automatically result in the absolute waiver of the right to remain silent, but that a defendant who desires to introduce expert testimony at trial must cooperate with a court expert in order to give the state an opportunity to rebut the defendant's expert testimony.

As the foregoing discussion illustrates, it is clear that a defendant has the right to have his *Ake* motion decided in secret based on the evidence he presents in support of it. The question is when must a defendant who has filed an *Ake* motion for funds and who has filed a notice of intent to raise the defense of insanity be evaluated by a court expert under § 17-7-130.1. *Motes* does not purport to answer this question; it simply provides that a defendant who desires to introduce expert testimony must cooperate with a state's expert. We must therefore devise a solution that honors the competing interests of *Ake* and § 17-7-130.1. In recognition of a defendant's rights under

---

[5] Although we held in *Lindsey v. State*, 254 Ga. 444, 449 (330 SE2d 563) (1985), that a trial court is authorized to appoint an expert to assist it in determining whether the defendant's sanity will be a significant factor in his defense, we did not indicate whether we were contemplating an expert appointed under § 17-7-130.1 who would report back to the prosecutor. Of course, the trial court would be authorized under *Ake* to appoint an expert who would report back to the court and the defense or to appoint an expert under § 17-7-130.1 if the defendant agrees to such an evaluation. Nothing in *Lindsey* stands for the proposition that a trial court may condition ruling on a defendant's *Ake* motion on the defendant's cooperation with a court expert appointed under § 17-7-130.1. Further, as the record in *State v. Grant*, 257 Ga. 123, 126 (355 SE2d 646) (1987), shows that the defendant merely filed a naked demand for expert assistance at public expense, nothing in the *Grant* opinion is inconsistent with our holding today.

*Ake* to have a fair opportunity to present a defense of insanity and to initially prepare that defense in secret, we conclude that a defendant who obtains expert assistance under *Ake* need not submit to an examination of a state expert until he has had an opportunity to decide whether to present expert assistance at trial. However, in recognition of the state's interest under § 17-7-130.1 to have an opportunity to rebut a defendant's expert testimony at trial, the defendant must cooperate with the court expert in time for the state to adequately prepare its evidence in response to the defendant's expert testimony. If the defendant does not, then a trial court would be authorized to preclude the defendant from presenting his own expert evidence.

For the foregoing reasons, Bright is not procedurally barred from contending that the evidence he offered in support of his motion was sufficient to meet the requirements of *Ake* and *Roseboro*. In this regard, if Bright had obtained independent expert assistance and still refused to cooperate with the state's expert, the remedy would have been for the trial court to deny Bright the right to present expert testimony at his trial. *Motes,* 256 Ga. at 832-833.

(e) We turn now to the issue whether Bright met his preliminary burden of demonstrating his need for a psychiatrist, a neurologist, and a toxicologist at the guilt and punishment phases of his trial.

With respect to the guilt phase, we conclude that Bright did not make an adequate showing. At the guilt phase of the trial, Bright could possibly have used expert assistance to establish an insanity defense or a voluntary intoxication defense. To establish an insanity defense, Bright would have had to show that he did not have the ability to distinguish between right and wrong at the time of the alleged crimes. To establish a voluntary intoxication defense, Bright would have had to show that the intoxication had "resulted in the alteration of brain function so as to negate intent. Even then, the brain function alteration must be more than temporary." *Horton v. State,* 258 Ga. 489, 491 (371 SE2d 384) (1988). Accord *Hayes v. State,* 262 Ga. 881, 883 (426 SE2d 886) (1993).

Although Bright offered evidence of a serious history of drug abuse, of depression stemming from guilt over past actions, of drug abuse on the night of the crimes, and of a troubled family history, this evidence does not demonstrate by itself an inability to distinguish between right and wrong or a permanent brain function alteration. Moreover, when considered with the evidence that Bright is of average intelligence, has a good memory, suffers from no hallucinations or illusions, has good continuity of thought, and was aware of his substance abuse and expressed his desire for help, we cannot conclude that the foregoing evidence adequately demonstrated that Bright's mental condition, that is, his inability to distinguish right from wrong or his inability to form the intent necessary for the crime

due to a permanent alteration of brain function, would be a significant issue at the guilt phase of the trial.

In addition, the evidence of head injuries that Bright suffered as a child, coupled with the study published in the American Journal of Psychiatry, does not demonstrate that any neurological impairment of Bright would be a significant issue at the guilt phase of the trial. To conclude that neurological impairment would be a significant issue would amount to sheer speculation in light of the evidence at the ex parte hearing of Bright's cognitive abilities.

For these reasons, we conclude that the trial court did not err by denying Bright's request for a psychiatrist, neurologist, or toxicologist to assist at the guilt phase of the trial.

We reach a different conclusion with regard to the punishment phase. At the outset, we note that the determination whether expert assistance is required at the penalty phase requires consideration of a different set of factors than the determination whether expert assistance is necessary at the guilt phase.

Regarding the evidence that is admissible in mitigation at the sentencing phase of a death penalty case, this Court has held as follows:

> In this state, juries are not required to balance aggravating circumstances against mitigating circumstances. Rather, the death sentence may be considered only if the state establishes beyond a reasonable doubt at least one of the statutory aggravating circumstances set forth in OCGA § 17-10-30, and if such a circumstance is established, the jury nonetheless "may withhold the death penalty for any reason, or without any reason." *Smith v. Francis*, 253 Ga. 782, 787 (325 SE2d 362) (1985).

*Ford v. State*, 257 Ga. 461, 464 (360 SE2d 258) (1987).

> This court . . . has consistently refused to place unnecessary restrictions on the evidence that can be offered in mitigation at the sentencing phase of a death penalty case. See, e.g., *Brooks v. State*, 244 Ga. 574, 584 (261 SE2d 379) (1979); *Cobb v. State*, 244 Ga. 344 (28) (260 SE2d 60) (1979); *Spivey v. State*, 241 Ga. 477, 479 (246 SE2d 288) (1979); *Brown v. State*, 235 Ga. 644 (3) (220 SE2d 922) (1975). See also *Lockett v. Ohio*, 438 U. S. 586, 604 (98 SC 2954, 57 LE2d 973) (1978), which held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record

and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis in original, footnotes omitted.) In *Cofield v. State*, 247 Ga. 98 (7) (274 SE2d 530) (1981), we held that, whether or not *Lockett v. Ohio*, supra, required it, in Georgia, a mother's testimony that she loved her son and did not wish to see him executed was admissible in mitigation in a death penalty case.

*Romine v. State*, 251 Ga. 208, 217 (305 SE2d 93) (1983). In *Romine*, 251 Ga. at 217-218, we went on to conclude that a grandfather's testimony of his desire not to see his grandson executed should have been admitted into evidence at the sentencing phase of the trial. Id. at 464.

In a similar vein, the United States Supreme Court has stated that

[w]hile the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, [cit.], requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Woodson v. North Carolina*, 428 U. S. 280, 304 (96 SC 2978, 49 LE2d 944) (1976).

Thus, it has been held that even if a defendant can distinguish between right and wrong, evidence of a diminished capacity to fully appreciate the "cruelty and gravity of his acts," *Starr*, 23 F3d at 1293, is critical at the penalty phase of a capital case "because in our system of criminal justice acts committed by a morally mature person with full appreciation of all their ramifications and eventualities are considered more culpable than those committed by a person without that appreciation." Id. at 1290. Several federal courts have held that evidence of drug and alcohol abuse constitutes some evidence of impaired ability so as to constitute mitigating evidence. *Smith*, 914 F2d at 1167-1168; *Jeffers v. Lewis*, 5 F3d 1199, 1204 (9th Cir. 1992); *Hargrave v. Dugger*, 832 F2d 1528, 1534 (11th Cir. 1987). In fact, the U. S. Supreme Court in *Parker v. Dugger*, 498 U. S. 308 (111 SC 731, 736-737, 112 LE2d 812) (1991), also stated that a defendant's evidence of intoxication could serve as a mitigating factor authorizing a life sentence.

Here, we need not decide whether evidence of isolated drug or

alcohol abuse would entitle a defendant to independent expert assistance at public expense, for we conclude that Bright's evidence regarding his depression, suicidal thoughts, poor impulse control, severe drug dependency, and severe intake of drugs and alcohol on the night of the crimes is sufficient, in combination with the fact that he contends that he impulsively murdered two grandparents with whom he had a good relationship, to meet his burden to show that his capacity to understand the cruelty of the acts he committed on his grandparents would be a significant issue at the penalty phase of the trial.[6]

Moreover, we conclude that an expert would have been of assistance to Bright in preparing evidence in mitigation. It has been stated that "[i]f [a] witness has special knowledge in any area so that his opinion could aid the jury, he should be qualified as an expert," Rumsey, Agnor's Ga. Evid. (3rd ed.), § 9-5, and that the proper "subjects of expert testimony are too numerous to mention," id. In this case, the issue is whether the experts Bright sought could have aided Bright by assisting lay jurors in making an educated determination of Bright's capacity to control and understand his actions at the time he committed the crimes. We conclude that the toxicologist and the psychiatrist could have provided valuable assistance to Bright. A toxicologist could have scientifically evaluated the effects of a history of cocaine abuse, as well as the severe abuse of drugs and alcohol on the night of the murders, on Bright's mental condition. Similarly, a psychiatrist could have evaluated, in terms beyond the ability of the average juror, Bright's ability to control and fully appreciate his actions in the context of the events that arose on the night of the murders, given his severe intoxication, his history of substance abuse, his troubled youth, and his emotional instability. We reach a different conclusion, however, with regard to Bright's request for a neurologist, finding that Bright has not demonstrated how a neurologist would have been of assistance with regard to the foregoing issues.

Finally, although at sentencing Bright did rely on his own testimony from the guilt-innocence phase of the trial regarding his intoxicated condition on the evening of the murders, and although he possibly could have offered other non-expert evidence regarding his history of drug abuse, his intoxication on the evening of the crimes, his emotional troubles, and his troubled youth, Bright's testimony, as would have any other non-expert evidence he could have offered, only in-

---

[6] A number of the foregoing factors, including severe substance abuse at the time of the crimes, were not present in *Christenson*, 261 Ga. at 83, in which we concluded that Christenson was not entitled to expert assistance at the sentencing phase of his trial. Moreover, in *Christenson* the defendant had been evaluated by a psychiatrist to determine whether the defendant's mental condition would be at issue at trial, and the psychiatrist's report was unfavorable to Christenson. For these reasons, we conclude that *Christenson* is distinguishable from the present case.

artfully covered the issues in question and did not provide Bright with the meaningful scientific and psychiatric evidence that a defendant with money could have offered in his defense.

For the foregoing reasons, we hold that the trial court erred by failing either to grant Bright funds to hire the experts he had contacted or to appoint equivalent experts of the court's own choosing.

(f) As evidence of diminished capacity would have provided perhaps Bright's sole defense at sentencing and as the experts in question could have assisted Bright in that defense, we conclude that the trial court committed harmful error in failing to appoint a psychiatrist and toxicologist or to grant Bright funds to hire ones of his own choosing. See *Starr*, 23 F3d at 1293.

3. In his second enumeration of error, Bright contends the trial court's charge on voluntary intoxication impermissibly relieved the state of the burden of proof on the element of intent.

The trial court's charge on voluntary intoxication was as follows:

> Our law provides that voluntary intoxication shall not be an excuse for any criminal act. It provides further that if a person's mind, when unexcited by intoxicants, is capable of distinguishing between right and wrong and reason and acting rationally, and he voluntarily deprives himself of reason by consuming intoxicants and while under the influence of such intoxicants, he commits a criminal act, he is criminally responsible for such act to the same extent as if he were sober. Whether or not the defendant was voluntarily intoxicated at or during the time alleged in this indictment is a matter solely for you, the jury, to determine.

Relying on *State v. Erwin*, 848 SW2d 476 (Mo. 1993), Bright contends that this charge effectively instructed the jury that if it found that Bright was voluntarily intoxicated, it had to find that Bright intended his criminal conduct, regardless of whether the state had otherwise met its burden of proving intent. Bright contends the charge thus impermissibly relieved the state of proving the element of intent. Although the four to three decision in *Erwin* supports Bright's contention, we disagree with the reasoning of the majority in *Erwin*.

We find nothing in the instruction from which a juror could conclude that a defendant is criminally responsible for his conduct simply as a result of his voluntary intoxication. Instead, this instruction, coupled with the standard instruction on the state's burden of proving the defendant acted with the requisite intent, informs a jury that if the state has proven intent, the defendant cannot be excused from his conduct based upon his voluntary intoxication. See *Erwin*, 848

SW2d at 485 (dissenting opinion).[7]

For this reason, we find no merit to this enumeration of error.

4. We find no merit to Bright's fourth enumeration of error, in which he contends that the fact that he did not have a preliminary hearing requires that we reverse his conviction. *State v. Middlebrooks*, 236 Ga. 52, 54 (222 SE2d 343) (1976) ("in no event will we overturn a conviction on direct appeal or on collateral attack because a commitment hearing was denied appellant"); *Cargill v. State*, 255 Ga. 616, 621-622 (1) (340 SE2d 891) (1986); *Corn v. State*, 142 Ga. App. 798 (2) (237 SE2d 203) (1977).

5. In his fifth, sixth, and seventh enumerations of error, Bright contends that the court erred in denying his motions to suppress evidence. We address each of these in turn.

(a) On the evening of the murders, after the victims were discovered, one of the victims' neighbors told police that she had seen a car matching the description of Bright's mother's car at the scene of the murders, and that she had seen there a man whom she believed to be the victims' grandson or nephew. Bright's mother confirmed the description of her car and told police that Bright had taken the car without permission. Bright's brother told police that Bright could have hurt his grandparents. Based on this information, the investigating officers issued a lookout for Bright's mother's car, asking that Bright be stopped for questioning.

Later, an officer identified the car and called for backup. After backup arrived, the officer stopped the car, and Bright got out. The officer asked Bright for identification. Bright reached under the seat of the car, whereupon the officer drew his gun. The officer asked Bright to raise his hands, and upon seeing that Bright was not holding a weapon, the officer put his gun away. The officer then frisked Bright. Meanwhile, another officer discovered on the window ledge outside the door of the car an object which the officer recognized to be a crack pipe containing residue of crack cocaine. The second officer placed Bright under arrest for possession of a controlled substance.

After Bright was arrested, the police obtained various physical items from Bright's body and car, including blood-stained money and clothing. The police also obtained statements from Bright following his arrest. Bright contends that the statements and physical evidence should have been suppressed as the fruits of an illegal seizure. Specifi-

---

[7] We note that Bright did not request a legally accurate instruction on the defense of voluntary intoxication, see *Horton*, 258 Ga. at 491; *Hayes*, 262 Ga. at 883; *Brown v. State*, 264 Ga. 48, 51 (441 SE2d 235) (1994), and that the instruction that Bright contends should have been given to make the trial court's charge complete under Georgia law is not legally accurate, *Horton*, 258 Ga. at 491; *Hayes*, 262 Ga. at 883; *Brown*, 264 Ga. at 51, and is not required to be given, *Foster v. State*, 258 Ga. 736, 743-745 (374 SE2d 188) (1988).

cally, he argues that the initial stop and seizure, before discovery of the alleged crack pipe, constituted an arrest for which the police lacked probable cause. He further contends that the subsequent discovery of alleged drug paraphernalia did not justify arrest, solely or in combination with the police officer's subjective assessment that residue on the pipe was crack cocaine.

The court did not err in denying the motion to suppress. The initial stop and brief detention of Bright was not tantamount to an arrest. A stop pursuant to a lookout requires, not probable cause, but only specific and articulable facts which, together with rational inferences drawn therefrom, reasonably warrant the intrusion. *McGhee v. State*, 253 Ga. 278, 279 (319 SE2d 836) (1984); *Brisbane v. State*, 233 Ga. 339, 341-342 (211 SE2d 294) (1974). The police, after speaking with Bright's family members and neighbors of the victims, had ample specific and articulable facts to justify the stop. That the officer called for backup and at one point drew his gun does not transform the stop into an arrest under the circumstances of this case. See *State v. Grimes*, 195 Ga. App. 773, 775 (395 SE2d 42) (1990); *Walton v. State*, 194 Ga. App. 490, 492 (390 SE2d 896) (1990). The officer's subsequent observation of a crack pipe and of crack cocaine residue on the pipe was probable cause for the arrest for possession of a controlled substance. See *Scott v. State*, 201 Ga. App. 162, 164 (410 SE2d 362) (1991); *Gibson v. State*, 193 Ga. App. 450, 450-452 (388 SE2d 45) (1989). The officer testified to his familiarity with such residue. Bright's reliance upon *State v. Casey*, 185 Ga. App. 726, 727 (365 SE2d 878) (1988), is misplaced, because that case involved suspected marijuana residue on an ordinary tobacco pipe, not cocaine residue on a distinctive crack pipe.

(b) Bright next contends that the court erred in denying his motion to suppress several of his custodial statements on the ground that his first inculpatory statement, taken 16 hours after his arrest, was involuntary, and his subsequent statements were the fruits of the original involuntary statement. Bright states that he was incapable of giving a voluntary statement, or of waiving his *Miranda* rights, because he had been awake for 34 hours; he was subjected to unceasing interrogation from the time of his arrest; the police had made misleading and coercive statements to him, including threatening him with the possibility of a death sentence; he had not consulted family, friends or an attorney; he was under considerable stress and distraught; and he was suffering from the effects of cocaine and alcohol withdrawal. Bright also complains that, during the interrogation, he was traumatized by being taken to the scene of the murders, where he and the officers sat in an unmarked car at a distance from the scene for one and one-half to two hours, waiting for the media to leave. Bright argues that although mental instability is not in itself suffi-

cient to render a confession involuntary, because of his mental instability, he was particularly vulnerable to coercive police tactics.

The state bears the burden of demonstrating the voluntariness of a confession by a preponderance of the evidence. *Lego v. Twomey*, 404 U. S. 477, 489 (92 SC 619, 30 LE2d 618) (1972); *Maggard v. State*, 259 Ga. 291, 292 (380 SE2d 259) (1989). The trial court's findings of fact and credibility after a *Jackson v. Denno* hearing are to be accepted unless clearly erroneous. *Sanborn v. State*, 251 Ga. 169, 170 (304 SE2d 377) (1983). Evidence was presented in the *Jackson v. Denno* hearing that there were many breaks in Bright's interrogation, that he did not appear tired and said he was not tired, that he declined to make telephone calls, that he was given food, drink and cigarettes, that he did not appear to be under the influence of drugs or alcohol, and that he appeared to be thinking clearly. Evidence was also presented that the police officers made no coercive statements to Bright, that Bright consented to go to the crime scene, and that the officers left the scene with Bright at his request. Even if Bright had been exhibiting symptoms of drug withdrawal, that fact does not render his statements involuntary. See *Holcomb v. State*, 254 Ga. 124, 126-127 (326 SE2d 760) (1985); *Fields v. State*, 232 Ga. 723, 724 (208 SE2d 822) (1974). Because the evidence supports the trial court's finding that Bright's statement was voluntary, we find no error in the trial court's ruling. See *Head v. State*, 262 Ga. 795, 797 (426 SE2d 547) (1993); *Blackwell v. State*, 259 Ga. 810, 811 (388 SE2d 515) (1990).

(c) The court likewise did not err in denying the motion to suppress two statements made by Bright outside the presence of counsel after an attorney had been appointed to represent him. The evidence presented to the trial court supported the conclusion that on both occasions Bright initiated the contacts, was advised of his rights and made a valid waiver of his rights. As this Court stated in *Roper v. State*, 258 Ga. 847 (375 SE2d 600) (1989), cert. denied, *Georgia v. Roper*, 493 U. S. 923 (110 SC 290, 107 LE2d 270) (1989), once an accused in custody invokes his right to counsel, he should not be interrogated further without counsel present, "unless the accused himself initiates further communication, exchanges or conversations with the police." Id. at 849. Where, as here, the accused initiates further discussions and knowingly and intelligently waives his *Miranda* rights, he may be interrogated further even if he has made a previous unequivocal request for counsel. *Brockman v. State*, 263 Ga. 637, 639 (436 SE2d 316) (1993); *Guimond v. State*, 259 Ga. 752, 754 (386 SE2d 158) (1989); *Housel v. State*, 257 Ga. 115, 121-122 (355 SE2d 651) (1987).

6. Contrary to Bright's contention in his ninth enumeration of error, the court did not err in denying the defense the opportunity to

review before trial photographs of the crime scene, of Bright, and of the victims at the crime scene and during autopsy; and in denying the defense use of the photographs during the suppression hearing. There is no general right to discovery in a criminal case. *Pruitt v. State*, 258 Ga. 583, 585 (373 SE2d 192) (1988), cert. denied, 493 U. S. 1093 (110 SC 1170, 107 LE2d 1072) (1990). A criminal defendant may not use a notice to produce to secure review, in advance of a trial or evidentiary hearing, of the district attorney's file. *Gilstrap v. State*, 256 Ga. 20, 21 (342 SE2d 667) (1986). In a criminal case, a notice to produce pursuant to OCGA § 24-10-26 may compel production of evidence needed for use on behalf of the defendant. Id.; *Sims v. State*, 251 Ga. 877, 879-880 (311 SE2d 161) (1984). Bright has made no showing that the photographs would have helped his defense or that the outcome of trial would have been any different had the photographs been disclosed prior to trial.[8]

7. The court did not abuse its discretion in denying Bright's motion to sever the cocaine charge from the murder charges. Two or more offenses may be joined in one charge when the offenses are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan and where it would be almost impossible to present to a jury evidence of one of the crimes without permitting evidence of the other. *Stewart v. State*, 239 Ga. 588, 589 (238 SE2d 540) (1977); *Dingler v. State*, 233 Ga. 462, 463 (211 SE2d 752) (1975). It is undisputed that Bright used crack cocaine before and after the murders, that he spent the day of the murders engaging in a series of acts to obtain money for drugs, including selling his blood, clothing, and at least one item which did not belong to him, and that he visited his grandparents for the purpose of obtaining money to buy crack cocaine. Furthermore, Bright blames the effects of crack cocaine for the murders. Therefore, the trial court did not abuse its discretion in concluding that the cocaine use and the murders were part of the same conduct and the same continuous scheme to obtain more drugs. See *Goughf v. State*, 232 Ga. 178, 180-181 (205 SE2d 844) (1974).

For these reasons, we find no merit to Bright's eighth enumeration of error.

8. In his tenth enumeration of error, Bright contends that the trial court erred by failing to grant his motion to excuse prospective juror Thompson for cause on the ground that Thompson admitted having formed an opinion regarding Bright's guilt. We find no error.

---

[8] Bright also contends that the court erred in denying the defense notice, until the Friday before trial was to begin on Monday, of the prior convictions the state used in aggravation in the sentencing phase. Because we reverse the sentence on other grounds, this issue is moot.

" 'When a prospective juror has formed an opinion based on hearsay (as opposed to being based on his having seen the crime committed or having heard the testimony under oath), to disqualify such individual as a juror on the ground that he has formed an opinion on the guilt or innocence of a defendant, the opinion must be so fixed and definite that it would not be changed by the evidence or charge of the court upon the trial of the case.' [Cits.]" *Waters v. State*, 248 Ga. 355, 362 (283 S.E.2d 238) (1981).

*Childs v. State*, 257 Ga. 243, 250 (357 SE2d 48) (1987). Accord *Hall v. State*, 261 Ga. 778, 781 (415 SE2d 158) (1991); *Spivey v. State*, 253 Ga. 187, 196-197 (319 SE2d 420) (1984).

As the prospective juror "testified that he could set aside his opinion, accord the defendant his presumption of innocence, and decide the case on the evidence presented at trial," *Hall*, 261 Ga. at 781, we hold that the trial court's ruling that the juror was qualified is not clearly erroneous, see *Hall*, 261 Ga. at 781.

Bright also contends that four other jurors should have been excused for cause because they had formed opinions regarding Bright's guilt or made other statements indicating that they could not fairly and impartially judge Bright's case. We conclude that the record does not support these assertions of bias, and that, in any event, Bright is procedurally barred from raising this issue because he did not object to the qualification of these jurors, see *Blankenship v. State*, 258 Ga. 43 (2) (365 SE2d 265) (1988); *Whittington v. State*, 252 Ga. 168, 173-174 (313 SE2d 73) (1984).

9. We find no merit to the contention, contained in Bright's eleventh enumeration of error, that the trial court improperly restricted Bright's voir dire of several jurors concerning their ability to view gruesome photographs and his voir dire of one juror regarding her ability to be impartial. See *Spencer v. State*, 260 Ga. 640, 641 (398 SE2d 179) (1990); *Baxter v. State*, 254 Ga. 538, 543-544 (7) (331 SE2d 561) (1985).

10. After the state and the defense had finished with the third juror in the jury selection process, the defense made an objection pursuant to *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). The trial court informed defense counsel that the proper time to make the challenge was after the selection of the jurors was completed and that the court would hear any *Batson* issue at that point. However, after the jury was selected, the trial court asked defense counsel if there were any motions that he wished to present. Defense counsel responded that there were not. The court then specifically asked defense counsel if he had "anything on what you said?" The defense counsel stated that he did not. The defense did not subse-

quently make any *Batson* challenge. Under these circumstances, we conclude that Bright's present *Batson* claim is not timely made. See *Brantley v. State*, 262 Ga. 786, 789 (4) (427 SE2d 758) (1993); *State v. Sparks*, 257 Ga. 97 (355 SE2d 658) (1987).

11. Contrary to Bright's assertion in his fifteenth enumeration of error, we cannot conclude that the alleged leading and conclusory questions asked by the prosecutor during voir dire impaired the selection of an impartial jury. See *Thornton v. State*, 264 Ga. 563, 573 (13) (c) (449 SE2d 98) (1994).

12. Bright filed a challenge to the jury pool on the ground that young persons age 18 to 30 were underrepresented. In his sixteenth enumeration of error, Bright contends that the trial court erred by denying this challenge. We find no error, as the record shows that Bright failed to prove both that young persons are a cognizable group in Muscogee County at the present time and that they have been consistently underrepresented. *Potts v. State*, 259 Ga. 812, 813 (1) (388 SE2d 678) (1990).

13. In Bright's seventeenth enumeration of error, he contends that the evidence is insufficient to support his conviction of possession of cocaine. When Bright was arrested he was in possession of a pipe used to smoke crack cocaine. The state offered evidence that showed that, although no useable cocaine was in the pipe, the residue in the pipe was cocaine. The state also offered evidence that Bright had smoked cocaine on the evening in question. Bright contends that as there was no evidence of a useable amount of cocaine, he may not be convicted of the possession thereof. The law in this state is to the contrary. *Partain v. State*, 139 Ga. App. 325 (228 SE2d 292) (1976); *Lush v. State*, 168 Ga. App. 740, 743 (6) (310 SE2d 287) (1983). Moreover, contrary to Bright's contention, we conclude that there was sufficient evidence of possession. See *Griggs v. State*, 198 Ga. App. 522, 523 (402 SE2d 118) (1991); *Pittman v. State*, 208 Ga. App. 211, 214 (430 SE2d 141) (1993). This evidence is sufficient to support Bright's conviction for possession of cocaine. *Jackson v. Virginia*, supra.

14. As Bright failed to object to the trial court's admission of certain physical evidence on the ground that the state failed to establish a chain of custody, Bright is procedurally barred from raising that issue now. See *Earnest v. State*, 262 Ga. 494, 495 (422 SE2d 188) (1992). Moreover, Bright failed to object to a police detective's testimony that there was blood on the physical evidence in question. He therefore may not raise this issue on appeal. Id. Accordingly, we find no merit to Bright's eighteenth enumeration of error.

15. In his nineteenth enumeration of error, Bright contends that the state impermissibly placed his character into evidence on three occasions. The first concerns the testimony of the state's fingerprint expert that he compared a fingerprint taken from the crime scene

with a fingerprint card on Bright on file at the police department from a previous arrest. Bright, however, failed to object to this testimony and is procedurally barred from raising this issue on appeal. *Earnest*, 262 Ga. at 495. Bright also contends that the trial court erred by admitting the previous fingerprint card into evidence and sending it out with the jury. However, as any information regarding prior criminal activity was redacted from the card, there was no error. See *Williams v. State*, 184 Ga. App. 124, 125 (361 SE2d 15) (1987); *McGuire v. State*, 200 Ga. App. 509, 510 (2) (408 SE2d 506) (1991). Finally, Bright contends that the trial court erred by admitting one of his statements into evidence without redacting a part of the statement in which Bright mentioned that he was on parole at the time of the crimes in this case. Again, however, Bright failed to object to this testimony at trial and is thus procedurally barred from raising the issue on appeal. *Earnest*, 262 Ga. at 495.

16. We find that the trial court did not abuse its discretion in admitting into evidence allegedly cumulative, gruesome photographs of the deceased victims. *Osborne v. State*, 263 Ga. 214, 215 (2) (430 SE2d 576) (1993); *Isaac v. State*, 263 Ga. 872, 873 (440 SE2d 175) (1994); *Brantley v. State*, 262 Ga. 786, 792 (427 SE2d 758) (1993). Contrary to Bright's contention, none of the photographs were autopsy photographs depicting alterations of the victims' bodies by the state. See *Brown v. State*, 250 Ga. 862, 866 (5) (302 SE2d 347) (1983). For these reasons, we find no merit to Bright's twentieth enumeration of error.

17. Contrary to Bright's twenty-first enumeration of error, we conclude that Bright was not denied a fair trial by appearing at trial in allegedly wrinkled civilian clothing. Compare *Estelle v. Williams*, 425 U. S. 501 (96 SC 1691, 48 LE2d 126) (1976) (state cannot force accused to stand trial in identifiable prison clothing).

18. In his twenty-second enumeration, Bright contends that he was denied the right to a fair and impartial judge. The trial judge's law clerk had been an assistant district attorney at the time of the murders through the pendency of this case, was employed by the court less than two months before trial, and had accepted an offer to return to the district attorney's office while the motion for new trial was still pending. Bright contends that these facts give rise to an appearance of impropriety, and that therefore, the trial judge should have been disqualified from presiding over the trial or, at the very least, from presiding over the motion for a new trial.

In a hearing on this issue before a separate judge, the uncontradicted evidence showed that the law clerk never worked on Bright's case as an assistant district attorney or as a law clerk. Therefore, this issue is controlled by *Todd v. State*, 261 Ga. 766, 773 (410 SE2d 725) (1991), cert. denied, ____ U. S. ____ (113 SC 117, 121 LE2d 73)

(1992), and we find no error.

19. Bright contends that the prosecution's closing arguments in both phases of trial were inflammatory, misleading and prejudicial. Because we reverse the sentence on other grounds, issues relating to the sentencing phase argument are moot. Therefore, we address only those issues relating to the prosecution's argument in the guilt-innocence phase of trial.

(a) In closing argument in the guilt-innocence phase, the prosecutor made the following statements:

> [I]t's easy to tell that this is an important case. It's a case that we get few of down here, and it's one of the most horrible cases we've ever had down here in this courtroom; . . . This case is the most horrible situation that I submit we've had down here in my time.

Bright failed to raise any objections at trial to this portion of the closing argument. Therefore, the test for reversible error is whether the argument, even if improper, in reasonable probability changed the result of trial. *Thornton v. State*, 264 Ga. at 568; *Todd v. State*, 261 Ga. at 767. Because of the overwhelming evidence of guilt that was presented at trial, including Bright's own testimony, we conclude that, even assuming the argument was objectionable, there is no reversible error.

(b) The record does not support Bright's contention that the prosecutor attempted to inflame the jurors' emotions by calling attention to photographs of the victims' bodies. The state's use of the photographs as evidence of the number and location of wounds was proper. *Isaac v. State*, 263 Ga. at 873.

(c) Bright contends that the state improperly attempted to shift the burden of proof by repeatedly referring in the guilt-innocence phase argument to the failure of the defense to offer evidence of innocence. However, the state may properly draw inferences in argument from the nonproduction of witnesses. *Isaac*, 263 Ga. at 874; *McGee v. State*, 260 Ga. 178, 179 (391 SE2d 400) (1990). Bright made no attempt at trial to rebut the state's evidence of guilt; on the contrary, he admitted guilt. Therefore, we find no error.

Bright further contends that the prosecutor misstated the law by arguing that "it's impossible to stab somebody without having the intent to do it. . . . [T]he mere fact that he did it shows he had the intent." The defense did not object to this portion of the argument at trial, and we find no reasonable probability that the comment changed the outcome of the trial.

20. The court did not err in admitting, at the sentencing phase of trial, evidence of Bright's prior convictions. It is true that "once the

defendant raises the issue of intelligent and voluntary waiver with respect to prior guilty pleas, the burden is on the state to establish a valid waiver." *Pope v. State*, 256 Ga. 195, 209-210 (345 SE2d 831) (1986). However, Bright's prior convictions were admitted without objection or motion to exclude. Therefore, the issue whether his guilty pleas underlying the convictions were valid was never raised, and it was not incumbent upon the state to offer evidence that the pleas were entered intelligently, knowingly and voluntarily.

21. Bright complains that the court erred in denying certain requests to charge the jury in the sentencing phase. The primary basis of Bright's claim of error is that certain charges which were given in the guilt-innocence phase, but which would not apply in the sentencing phase, may have left the jury with misimpressions regarding the law to be applied in the sentencing phase. Bright sought to correct any misimpressions with the offered charges. Because we reverse the sentence, and a new jury will sit for retrial of the sentencing phase, these issues are moot.

22. As the evidence supports the jury's finding of statutory aggravating circumstances, OCGA § 17-10-30 (b) (2) and (b) (7),[9] the state may again seek the death penalty. See *Moore v. State*, 263 Ga. 11, 14 (9) (427 SE2d 766) (1993). Because of the reversal of Bright's sentence of death as set forth in Division 2 of this opinion, we need not address Bright's remaining enumerations of error concerning the sentencing phase of his trial.

*Convictions affirmed; death sentence reversed. All the Justices concur, except Hunstein, Carley and Thompson, JJ., who dissent as to the reversal of the death sentence.*

CARLEY, Justice, concurring in part and dissenting in part.

The majority affirms Bright's convictions, but concludes that his death sentences must be reversed because the trial court refused to grant the motion seeking funds for psychiatric assistance pursuant to *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985). I concur in the affirmance of Bright's convictions, but must respectfully dissent to the reversal of his death sentences.

Under *Ake*, supra at 83, funds for expert psychiatric assistance are available only to a defendant who has made a preliminary show-

---

[9] We note that, if the state retries Bright for the death penalty on remand, it needs to ensure that the jury's findings regarding whether it is returning a death sentence for the murder of the grandfather or the grandmother or both is clear; that the jury does not improperly rely on mutually supporting aggravating circumstances, see *Stripling v. State*, 261 Ga. 1, 8 (401 SE2d 500) (1991); and that, if the state relies on § 17-10-30 (b) (7) as an aggravating circumstance, the jury's (b) (7) finding is "in the conjunctive to ensure unanimity concerning the necessary elements of the (b) (7) circumstances." *Hill v. State*, 263 Ga. 37, 46 (22) (427 SE2d 770) (1993).

ing in the trial court that his sanity will "be a significant factor at trial. . . ." To facilitate this determination, "[t]he trial court is authorized to order a psychiatrist, or perhaps some other competent mental health expert, to examine the defendant. . . ." *Lindsey v. State*, 254 Ga. 444, 449 (330 SE2d 563) (1985) (Addendum). In addition to his motion seeking funds for expert assistance pursuant to *Ake*, Bright also filed notice of his intent to raise an insanity defense. Thus, pursuant to OCGA § 17-7-130.1, the trial court appointed a psychiatrist "to examine [him] and to testify at the trial." *Tolbert v. State*, 260 Ga. 527, 528 (2) (b) (397 SE2d 439) (1990). Despite the majority's reasoning, there is no authority which would preclude the trial court from ordering that the psychiatrist appointed to examine Bright pursuant to his notice under OCGA § 17-7-130.1 also address the additional issue of whether Bright's sanity was likely to be a significant factor in his defense pursuant to his *Ake* motion. See *Lindsey v. State*, supra at 449 (Addendum). It necessarily follows that it was not error for the trial court to deny Bright's *Ake* motion until such time as the court-appointed psychiatrist had addressed the issue of whether Bright's sanity was likely to be a significant factor in his defense. *State v. Grant*, 257 Ga. 123, 126 (2) (355 SE2d 646) (1987).

Thus, Bright's subsequent refusal to cooperate with the psychiatrist appointed pursuant to OCGA § 17-7-130.1 frustrated the trial court's effort to make the preliminary determination whether the *Ake* motion should be granted and was, in effect, a voluntary waiver of that motion. Had the court-appointed psychiatrist been allowed to examine Bright, the trial court presumably would have used the psychiatric report in making the determination whether sanity was likely to be a significant factor in Bright's defense. If, after considering the psychiatric report and all the other evidence, the trial court concluded that Bright's sanity was likely to be a significant factor, it then would have been required to appoint, or provide Bright with funds for, an expert who would work for and report to the defense alone. If, however, the trial court concluded that sanity was not likely to be a significant factor, Bright's motion would then have been denied and that ruling would be subject to review by this court. *Brown v. State*, 260 Ga. 153, 158 (7) (391 SE2d 108) (1990).

Citing no authority whatsoever, the majority nevertheless concludes that a defendant who seeks funds for expert assistance under *Ake* need not submit to an examination of a court-appointed expert until he has had an opportunity to decide whether to present expert testimony at trial. As the majority implicitly acknowledges, however, this conclusion is not required by any existing authority. Indeed, the majority's conclusion is in direct conflict with a prior decision of this court. In *State v. Grant*, supra at 126 (2), the trial court denied a motion seeking funds for expert assistance in the guilt-innocence and

sentencing phases of a death penalty case, after the defendant refused to submit to evaluation at Central State Hospital to determine whether his sanity would likely be a significant factor at trial. On appeal, this court affirmed the denial of the motion without examination, or even mention, of the evidence or lack of ex parte evidence presented by the defendant in support of his motion. Thus, what was dispositive in *Grant* was the defendant's refusal to submit to an independent psychiatric examination so as to facilitate the trial court's preliminary determination of whether sanity would likely be a significant factor at trial. Likewise, Bright's refusal to submit to an independent examination so as to facilitate the trial court's preliminary determination of whether sanity would likely be a significant factor at trial should be dispositive here.

Moreover, even assuming that Bright's refusal to cooperate with the court-appointed psychiatrist was not a voluntary waiver of his *Ake* motion, the holding in *Ake* only requires that the State

provide a defendant with "psychiatric assistance in presenting mitigating evidence at his sentencing proceeding, *where the [S]tate presents psychiatric evidence against the defendant.*" *Bowden v. Kemp*, 767 F2d 761, 763 (11th Cir. 1985).

(Emphasis supplied.) *Christenson v. State*, 261 Ga. 80, 83 (2) (c) (402 SE2d 41) (1991). Here, the State "presented no psychiatric (or expert psychological) testimony at the sentencing phase of the trial. [Cit.]" *Christenson v. State*, supra at 83 (2) (c). See also *Walker v. State*, 254 Ga. 149, 154-155 (5) (327 SE2d 475) (1985).

*Ake* only guarantees a defendant the right to a psychiatrist at the sentencing phase to oppose the government's psychiatric testimony. . . . In *Bowden* [*v. Kemp*, 767 F2d 761 (11th Cir. 1985)], the court stated that "unlike the sentencing situation in *Ake*, Bowden's prosecutor had no need to present psychiatric evidence to show an aggravating factor, and he presented none. The dangers and inequities which concerned the Court in *Ake* consequently did not exist." [Cit.] Nor do those dangers and inequities exist in this appeal. The [S]tate presented no psychiatric experts at the sentencing phase. . . . As such, appellant was not constitutionally entitled to a state-funded psychiatrist under *Ake*.

*Kordenbrock v. Scroggy*, 919 F2d 1091, 1120 (6th Cir. 1990). See also *Gore v. Dugger*, 763 FSupp. 1110, 1120-1121 (M.D. Fla. 1989); *Pruett v. Commonwealth*, 351 SE2d 1, 7, fn. 3 (Va. 1986).

> [T]his is not a case in which the defendant might be entitled to psychiatric assistance at the sentencing phase even where the [S]tate does not present psychiatric testimony. [Cit.]

*Christenson v. State*, supra at 83 (2) (c). Contrary to the majority's holding, Bright presented no ex parte evidence from which the trial court could reasonably have inferred that the question of his *sanity* would be a significant mitigating factor at the sentencing phase of the trial. Bright's ex parte evidence did "not show that [he] suffers from any *serious mental disorder*." (Emphasis supplied.) *Christenson v. State*, supra at 83 (2) (c). To the extent that Bright's ex parte evidence might have been mitigating, he was deprived of no constitutional right by virtue of the fact that he was not afforded public funds so as to present that evidence through the testimony of a psychiatrist.

Accordingly, I believe that Division 2 of the majority opinion misapplies *Grant*, supra, and *Christenson*, supra, and that the holding therein is, therefore, in conflict with existing Georgia law. By departing from that existing Georgia law, the effect of today's holding is to insure that criminal defendants who assert the defense of insanity will have little, if any, motivation to cooperate with court-appointed psychiatrists in the preliminary determination of whether sanity will be a significant factor at trial. Accordingly, I must respectfully dissent to the reversal of Bright's sentences.

HUNSTEIN, Justice, dissenting.

The record in this case reveals that appellant filed both a notice of intent to assert insanity as a defense, see OCGA § 17-7-130.1; USCR 31.4, and a motion for funds for experts in neurology, toxicology, and psychiatry, pursuant to *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985), to assist the defense in both the guilt-innocence and penalty phases of the trial. The motion comported with *Roseboro v. State*, 258 Ga. 39 (365 SE2d 115) (1988). The trial court conducted the ex parte hearing required by *Brooks v. State*, 259 Ga. 562 (2) (385 SE2d 81) (1989) and denied the motion for funds, although the court stated that it would reconsider the motion upon the return of the results in the court-ordered psychiatric examination (referencing appellant's notice of intent per OCGA § 17-7-130.1). Appellant subsequently refused to cooperate in that examination.

The Fourteenth Amendment's due process guarantee of fundamental fairness requires that an indigent defendant be given "meaningful access to justice," e.g., access to a competent expert necessary to an effective defense. *Ake v. Oklahoma*, 470 U. S., supra at 77; *McNeal v. State*, 263 Ga. 397 (3) (435 SE2d 47) (1993). However, "due process does not require the government automatically to provide in-

digent defendants with expert assistance upon demand." *Moore v. Kemp*, 809 F2d 702, 712 (11th Cir. 1987). Rather, the constitutional requirement that a state provide an indigent defendant access to an expert's assistance applies only when a defendant has made a "preliminary showing" that the subject-matter of the expert's specialization is likely to be a significant factor at trial. Id. Whether or not a defendant has made this showing lies within the sound discretion of the trial court. *McNeal*, supra. Furthermore, while this Court has recognized that *Ake* applies to expert assistance in presenting mitigating evidence at his sentencing proceeding, *Christenson v. State*, 261 Ga. 80 (2) (c) (402 SE2d 41) (1991), we did not find it necessary to apply a different standard for an *Ake* request based on which phase of the trial in which the expert was deemed necessary. Id. at 83 (2) (c).

Applying these principles, I can concur completely in the majority's conclusion that appellant was not entitled to funds for any of the three experts for use in the guilt-innocence phase or for the neurologist as to the penalty phase. I must respectfully dissent to the majority's holding that the denial of funds for the psychiatrist and toxicologist for use in the penalty phase was reversible error.

As to the psychiatric expert, I would affirm the trial court's ruling because this case is indistinguishable from *Christenson*, supra. In both cases, the defendants presented evidence that they had undergone psychological evaluation in the year prior to the crimes which indicated they suffered from no serious mental disorders. Although there are variations between the cases,[10] the salient fact remains that neither appellant nor Christenson adduced evidence showing a serious mental disorder. Because of the absence of any evidence of a serious mental disorder, we found no abuse of the trial court's discretion in denying the request for court-funded independent psychiatric assistance in *Christenson*, supra at 83 (2) (c). Likewise, because appellant has not made a preliminary showing that his "mental condition [at the time of the offense was] seriously in question," *Ake*, 470 U. S., supra at 82, I would find no abuse of the trial court's discretion in denying appellant the funds he sought for psychiatric assistance.

As to the toxicological expert, there is no question that appellant's usage of crack cocaine was a pivotal factor in his defense. In

---

[10] Appellant was diagnosed as depressed with suicidal thoughts whereas Christenson was diagnosed as manipulative and narcissistic; appellant abused cocaine while Christenson abused alcohol; appellant presented only his pre-crime evaluation whereas the trial court in *Christenson* had both a pre-crime and a post-crime evaluation before it. As to the cocaine abuse, I would note that "the fact of [appellant's] addiction alone is not enough to make his sanity a 'significant factor' at trial and thereby to satisfy the *Ake* threshold." *Volanty v. Lynaugh*, 874 F2d 243, 247 (5th Cir. 1989). As to the post-crime evaluation in *Christenson* I would note that the only significant item shown therein was that Christenson had sustained a decrease in his IQ level, which was attributed to drug usage.

this Court's review of the trial court's denial of funds for a toxicologist, however, the question is not whether the defense could have made use of such an expert. Rather, it is whether access to a toxicological expert was "necessary to an effective defense" such that denial of funds to hire the expert violated the Fourteenth Amendment's due process guarantee of fundamental fairness. Accord *Messer v. Kemp*, 831 F2d 946, 960 (11th Cir. 1987); *Moore*, supra. When viewed from that perspective, it is apparent that the trial court did not abuse its discretion denying appellant funds for a toxicologist.

In support of his motion[11] appellant attached his medical record from the Columbus substance abuse program where he had received treatment eight months before the crimes in issue. This record contained the observations of health care professionals who had previously evaluated appellant and diagnosed his cocaine dependency, who were personally familiar with appellant, and who possessed information regarding appellant's drug usage and considered such usage to pose a "[s]ubstantial risk of harm" to appellant and others.

Appellant made no showing why it was necessary that a toxicologist present evidence of the effect of cocaine on appellant's mentation or how much help this type of defense expert could have given. See *Little v. Armontrout*, 835 F2d 1240, 1243 (8th Cir. 1987); see also *Bowden v. Kemp*, 767 F2d 761, 765 (11th Cir. 1985). While a toxicologist's assistance in this regard would undoubtedly have been beneficial, in light of the presentation to the trial court of this pre-existing information and resources available to the defense, I do not agree that the denial of funds for a toxicologist deprived appellant of his ability to present an effective defense and rendered the trial fundamentally unfair. Hence, I find no abuse of the trial court's discretion in denying the motion for funds for a toxicological expert.

I am authorized to state that Justice Thompson joins in this dissent.

DECIDED MARCH 17, 1995 —
RECONSIDERATION DENIED MARCH 30, 1995.

*Worthington & Flournoy, Thomas M. Flournoy, Jr., Douglas L. Breault, Charlotta Norby,* for appellant.
*Douglas C. Pullen, District Attorney, J. Gray Conger, Julia Anne Fessenden, Susan L. Golomb, Assistant District Attorneys, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior As-*

[11] Although this dissent is premised solely on the evidence presented by appellant in support of his motion for funds, I find that even if the entire record is considered, see *Volanty*, supra at 247, n. 7, the outcome here is not changed.

*sistant Attorney General, Marla-Deen Brooks, Assistant Attorney
General,* for appellee.