## A92A1782. PITTMAN v. THE STATE.
(430 SE2d 141)

ANDREWS, Judge.

Pittman was indicted for possession of cocaine with intent to distribute. He was tried and convicted of possession of cocaine and appeals.

Viewing the evidence in the light most favorable to the verdict, Officer Hall with the Bibb County Sheriff's Department testified that on March 1, 1991, he received information from a confidential informer that a Quinn Mason was bringing more than ten pounds of cocaine from California to Macon. A second informer called Officer Hall at about 2:40 p.m. that same day and told him that Pittman and Anthony James, Quinn's brother, were transporting the cocaine for Quinn in a borrowed black Peugeot. The informer stated that he had actually seen the cocaine in the Peugeot. The informer told Officer Hall that at 2:30 p.m. the Peugeot was parked on Margaret Street and

---

Anthony James was waiting in the car for someone to come and pick up the cocaine.

Based on this information, Officer Hall went to the supposed location of the car, but did not see a Peugeot. After looking on Margaret Street for the vehicle, he passed Pittman driving the Peugeot. Hall followed the Peugeot and observed Pittman in a parking lot of a gym in the vehicle talking to Quinn Mason. Thereafter Pittman drove off towards the Macon shopping mall and Officer Hall called additional officers to help pursue him.

One of the officers called was Officer Wheat, who testified at trial. He stated as of March 1, 1991, he was familiar with Quinn Mason, Anthony James and Pittman and was told of the March 1, 1991 distribution plan. Wheat responded to Hall's call and stopped Pittman and searched the vehicle. He observed a pair of tennis shoes on the floorboard of the back seat, behind the driver's seat. During Wheat's search he also found $812, $800 of which was in $20 bills in a black tote pouch, which was near the driver's seat.

Officer MacDonald also testified at trial. He stated that he had performed a follow-up search during which he had discovered 20 grams of cocaine wrapped in a napkin, crammed in the toe of a tennis shoe. The cocaine was damp, was sticking to the napkin, and had shaped to the form of the toe. There was testimony that the dampness indicated that the manufacturing of the crack cocaine from cocaine hydrochloride was recent. There was also testimony that the cocaine would be worth up to $4,000 on the street.

After being arrested, Pittman denied that the shoes were his and said that they belonged to his girl friend's brother, Anthony James. Pittman did not know to whom the crack cocaine belonged. Pittman told one police officer that he thought he was being "set up."

Several days after the arrest, Pittman consented to a polygraph and stipulated that the results therefrom would be admissible at trial. The State presented evidence that Pittman registered "deceptive" on all of the critical questions on the polygraph examinations.

The defense called several witnesses. The owner of the Peugeot, Mark Steven McGowan, testified that he loaned his car to Pittman in February 1991 for a couple of weeks so that Pittman's out-of-town girl friend would have transportation during her visit. McGowan admitted that he was not well acquainted with Pittman.

Pittman's girl friend, Sonya Mason, testified. She stated that she presently lives in California and that she came to Macon to visit Pittman in February 1991. She stayed for ten days and left on March 1, 1991, the day Pittman was arrested. She testified that the morning of her March 1 departure, Pittman allowed her brother, Anthony James, to borrow the Peugeot, so that she and Pittman could spend some time alone together. She testified that during this period, she and

Pittman went to the mall in Pittman's Cadillac to look for work-out weights. Pittman did not have enough money to buy the $600 or $700 set. After that, they returned home, went by Pittman's parents' store at approximately 1:00 p.m., had lunch at a restaurant and then she began her return trip home. She verified that her brother had a pair of shoes like the ones found in the car.

Anthony James testified. He stated that he and Pittman are friends and that he, his sister, and his brother, Quinton, all came to visit Macon around March 1, 1991. James corroborated his sister's account of how he borrowed the Peugeot. He said that he borrowed the Peugeot on the morning of March 1 and went to get a friend of his so that they could work out. James said that he had his spa bag and his tennis shoes in the Peugeot with him. He testified that he took the gym bag out of the car, but forgot the shoes. James said that there was no reason to believe that Pittman knew that the shoes, or their hidden contraband, was in the car. When asked who put the cocaine in the shoe and to whom the cocaine belonged, James pled the Fifth Amendment. Nevertheless, he stated that he did not learn there was any cocaine in the shoes until after Pittman was arrested.

Defendant's mother testified at trial. She stated both that she gave Pittman the $800 which was found in the vehicle and that she did not give him that money. Defendant's father also testified.

Pittman testified at trial. His testimony was consistent with James'. He stated that the shoes found in the car were not his, that he did not know who the owner of the cocaine was and that the money was intended for buying work-out equipment.

1. In his first enumeration of error, Pittman claims that the trial court erred in denying his motion for a directed verdict and his motion for a new trial in that the evidence of constructive possession was outweighed by the evidence of equal access. He also argues that the evidence to convict him was insufficient. This enumeration is without merit. Furthermore, we find that the evidence to convict was sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In Pittman's second enumeration of error, he claims that the trial court erred in its charge to the jury on various aspects of constructive possession in that taken as a whole, the charge was confusing and burden-shifting. He also argues that the charge should have included instructions regarding equal access.

With regard to constructive possession, the court first exhaustively defined and explained actual and constructive possession. Later, the court further elaborated: "Now, I charge you further that while a finding of constructive possession must be based upon some connection between the defendant and the contraband, other than. . . . All right, spatial proximity, this connection may be estab-

lished by proof of occupancy and control over the vehicle by the defendant with no equal access by others. Under such circumstances in the absence of contrary evidence, a presumption arises that the driver's in control and possession of the contraband. Now, I charge you that the possession of contraband can be inferred from possession, custody and control of the vehicle in which the contraband was found. This inference, however, is a rebuttable inference which can be overcome by evidence presented during the trial. And I charge you that the jury is authorized to infer that the driver of a car in which contraband is found in the possession of that contraband, this inference, however, is a rebuttable one which can be overcome by evidence presented during this trial, if any."

Pittman argues that the portion of the instruction which referred to the rebuttable presumption which Pittman's possession, custody and control of the vehicle created was erroneous. We disagree. The court's first charge regarding constructive possession closely tracked the language of the Suggested Pattern Jury Instructions for Criminal Cases (Vol. II; IV, R (5); p. 136) and we find no error. Further, there is no error in the latter portion of the charge regarding the rebuttable inference of possession. See generally *Dalton v. State*, 249 Ga. 720 (292 SE2d 834) (1982).

Further, we reject Pittman's argument that the trial court erred in failing to instruct the jury regarding the doctrine of equal access. We note that although Pittman submitted several written requests to charge, he did not submit a charge regarding equal access. Although the trial court did not instruct the jury fully on the equal access rule, the court did not entirely omit reference to this rule.

"The equal access rule, entitling a defendant to acquittal where evidence is presented that others had equal access to a vehicle or that the vehicle had recently been used by others, applies only where the *sole evidence* of possession of contraband found in the vehicle is the defendant's ownership or possession of the vehicle. . . . Here, defendant's possession of the vehicle was not the sole evidence of his possession of the contraband found in it. Even if the contraband was in the possession of [James], evidence was presented whereby the jury could find that defendant was a party to the offense of possession. Therefore, we find no reversible error in the trial court's failure to charge the equal access rule." (Emphasis supplied.) *Wright v. State*, 194 Ga. App. 739, 741 (2) (391 SE2d 791) (1990); see also *Lance v. State*, 191 Ga. App. 701 (2) (382 SE2d 726) (1989).

The same result obtains here. In addition to the evidence that Pittman had access to the contraband and the power to exercise control over it, Pittman was carrying $812, mostly consisting of $20 bills with him at the time of his arrest, for which three different explanations were offered. Further, the results of his polygraph examination

were further evidence of his guilt.

3. In his next enumeration, Pittman argues that the trial court erred by failing to charge the equal access rule in that this constituted his sole defense. Again, we find no reversible error for several reasons.

First, we note that the concept of equal access was not entirely omitted from the court's charge. Secondly, it does not appear that the doctrine of equal access was Pittman's sole defense. He requested charges, which were given, regarding the fact that neither mere presence at the scene of the crime, nor mere association with persons charged with a crime authorizes a finding of guilt. The jury was charged extensively regarding the presumption of innocence, burden of proof, circumstantial evidence, and the necessary elements of the crime charged.

Finally, we are persuaded by the State's argument that in this case equal access is not a "sole defense," in the sense in which Pittman argues. "The equal access rule, as it applies in the automobile context, is merely that evidence showing that a person or persons other than the owner or driver of the automobile had equal access to contraband found in the automobile may or will, depending upon the strength of the evidence, overcome the presumption that the contraband was in the exclusive possession of the owner or driver." (Citations and punctuation omitted.) *Lombardo v. State*, 187 Ga. App. 440, 442 (5) (370 SE2d 503) (1988).

This court in *Jones v. State*, 205 Ga. App. 711, 713 (4) (423 SE2d 393) (1992) was presented with a similar situation to the case at bar. In *Jones*, the defendant argued that the trial court's failure to charge his sole defense of mere presence was reversible error. In rejecting that argument, this court stated "[I]f an affirmative defense is raised by the evidence the trial court must present the affirmative defense to the jury as part of the case in its charge, even absent a request. . . . Defendant's contention that he was merely present at the scene is not an affirmative defense; rather the rule that mere presence without more is insufficient to convict is really a corollary to the requirement that the state prove each element of the offense charged." (Citations and punctuation omitted.) Id. at 713; see generally OCGA § 16-3-28. Here, as in *Jones*, there was other evidence that Pittman committed the crime; the necessity of proof of guilt beyond a reasonable doubt was fully charged to the jury, and the principles of the equal access doctrine were presented sufficiently. Accordingly, we find no error.

4. In his next enumeration, Pittman argues that the trial court erred in its recharges to the jury concerning actual and constructive possession and the offenses of possession of cocaine with intent to distribute and simple possession of cocaine in that the instructions were confusing and misleading. During deliberations, the jury requested additional instructions and the trial court gave a recharge during

which he had a slip of the tongue. Despite this, the court's recharge regarding constructive possession was sufficiently clear and was appropriate. See generally *Caldwell v. State*, 167 Ga. App. 692, 695 (4) (307 SE2d 511) (1983).

Pittman also complains that in explaining the offenses of possession with intent to distribute and of simple possession, and by repeating that the jury had the option of finding the defendant innocent, the court created the impression that the only choice was to find the defendant guilty. We have reviewed the court's instructions and find this argument without merit. The jury was charged repeatedly with the law regarding presumption of innocence and the State's burden of proof and the explanation of the two crimes was proper. See generally *Nobles v. State*, 201 Ga. App. 483, 484 (2) (411 SE2d 294) (1991).

5. In his next contention, Pittman claims that his trial counsel, attorney Raley, was ineffective in that he had a conflict of interest and that the trial court erred in not so finding. The conflict to which Pittman refers is that at the time of the trial in June 1991, Raley also represented witness Anthony James. At the time of the trial, James had not been indicted for any crime arising from the March 1, 1991 incident. Nonetheless, he had been previously indicted for trafficking in cocaine for actions which took place on February 23, 1988, although this case had been temporarily dead-docketed. After Pittman's trial, in October 1991, James was reindicted for the trafficking charge; and, in a second count was charged with possession of cocaine with intent to distribute for his actions on March 1, 1991. James entered a guilty plea on April 17, 1992 to the charge of possession with intent to distribute cocaine, and the State dropped the trafficking count.

At the hearing on the motion for new trial, attorney Raley admitted that he discussed his representation of both men with Pittman, but that Raley did not see a conflict at the time he first met with him. Raley testified that he believed, when first consulted by Pittman, that the drugs had been planted in the car by a police officer. Raley agreed that he would get involved in the case if Pittman waived any conflict.

On March 4, 1991, both Pittman and James signed separate documents wherein they acknowledged Raley's representation of James in another case and agreed to a waiver of the conflict. On March 14, 1991, Raley had James sign a handwritten statement authorizing him to discuss with prosecutors James' involvement in the case against Pittman. The document, which was introduced at the motion for new trial hearing, stated that its purpose was to relieve Pittman from any responsibility for the drugs and to clarify that they belonged to James. The document from James stated that he understood that he · was not compelled to plead guilty to any involvement or ownership of cocaine, but that he did so with an understanding that it was a virtual

certainty that he would be imprisoned.

On May 13, 1991, James executed another document in which he again accepted responsibility for the possession of the cocaine.

In September 1991, after Pittman's trial, James issued a thorough confession in which he stated that the shoes were his and the cocaine in them was his. Subsequent to that statement, he was indicted.

Attorney Raley testified that until James was called as a witness at Pittman's trial, it was his understanding that James was going to testify that the drugs were his and exonerate Pittman. At trial, James testified that the shoes were his and that Pittman did not know the shoes were in the car. Nevertheless, James testified that he did not know who put the substance in the shoes and he then invoked the Fifth Amendment when asked whether the substance belonged to him.

We note at the outset that since no objection was raised at trial, it is necessary to show that an actual conflict of interest existed because of Raley's representation of both men. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. By actual conflict we mean more than the bare possibility that a conflict might have developed." (Citations and punctuation omitted.) *Kennedy v. State*, 177 Ga. App. 543, 544 (1) (340 SE2d 204) (1986); see also *Acierno v. State*, 176 Ga. App. 600, 601 (3) (337 SE2d 39) (1985).

Assuming arguendo, that an actual conflict existed here, the record contains Pittman's waiver of any such conflict. The waiver clearly states that Pittman was aware of the possibility of a conflict, and consented to Raley's representation of both him and James. At the hearing on the motion for new trial, Pittman stated that he had discussed Raley's representation of him and the potential conflict several times.

In *Shirley v. State*, 166 Ga. App. 456 (2) (304 SE2d 468) (1983), the court said that where each defendant "confirmed, on the record, that they had discussed the case thoroughly with their counsel, and each stated that there [was] no [conflict] of interest . . . that they were satisfied to proceed with one counsel . . . if any error occurred it was induced by these defendants' statements and induced error is impermissible." See also *Collins v. State*, 144 Ga. App. 102, 104 (1) (240 SE2d 597) (1977). Because of this waiver, and because no material prejudice has been demonstrated, we find this enumeration without merit. See generally *Rautenberg v. State*, 178 Ga. App. 165, 169 (8) (342 SE2d 355) (1986).

6. In another enumeration, Pittman claims that the trial court erred in refusing to allow his mother to testify that James had admitted to her on the day of Pittman's arrest that the substance in the

tennis shoe belonged to him and that Pittman had no knowledge of its presence. Although Pittman's attorney alluded to the expected testimony, the excluded testimony is not a part of the record. Thus, although Pittman objected to the court's failure to allow her to testify, because there was no offer of proof, we are unable to review this enumeration.

7. Pittman enumerates as error the trial court's denial of his motion to suppress and motion in limine in that the stop and the search of the Peugeot were without a warrant and without probable cause.

Pittman filed a motion to suppress and the trial court held a hearing regarding such motion. The evidence at the hearing was that in February 1991, Hall received information that Quinn Mason was going to bring cocaine to Macon from California and that Pittman and James were going to sell the cocaine. At approximately 2:40 p.m. on March 1, 1991, Officer Hall received a call from a confidential informer that Anthony James and Andrew Pittman were driving a black Peugeot and were transporting cocaine. The informer said that ten minutes earlier, the Peugeot was on Margaret Street, that Anthony James was driving, that he had cocaine in the car and that he was waiting for someone to come and pick the cocaine up. The informer said that he had seen the cocaine in the vehicle that day.

Officer Hall went to Margaret Street and drove around and did not find the black Peugeot. He was heading back towards town when he saw Pittman driving a black Peugeot. Officer Hall followed the vehicle to a gym parking lot and observed that the vehicle was parked and that Pittman was in the vehicle and Quinn Mason was talking to him. Hall continued driving and then turned around. At this point, he saw the black Peugeot pass him. He followed the car and Officer Wheat stopped the vehicle.

Officer Hall testified that he had known the informer who provided the information for seven months. Hall stated that the informer had given information previously which led to three convictions and had never given incorrect information. Hall explained that he did not get a warrant before going to Margaret Street, in part because of the urgency of the situation.

Prior to March 1 Officer Hall knew that Quinn Mason was involved in the drug trade and was on parole. Officer Hall also knew that James, Quinn's half-brother, had been arrested for cocaine violations. Hall also knew of Pittman prior to March 1.

" 'Whether a search is sought to be justified as incident to [an] arrest for possession of cocaine or whether it is sought to be justified by exigent circumstances, it cannot be upheld unless probable cause existed for a belief that the [suspect] was currently in unlawful possession of cocaine. Under the standard set forth by the United States Supreme Court in *Illinois v. Gates*, (462) U. S. (213) (103 SC 2317, 76

LE2d 527) (1983), probable cause may be predicated on an informant's tip only if, under the "totality of the circumstances," including the "veracity" and "basis of knowledge" of the informant, there is a "fair probability" that contraband or evidence of a crime will be found in a particular place.' " (Citations omitted.) *Salter v. State*, 198 Ga. App. 242, 243 (1) (401 SE2d 541) (1990).

Here, the confidential informer had supplied information to the officers on several occasions, three of which had led to arrests. Officer Hall's observation of Pittman driving the black Peugeot adequately corroborated the tip from the previously reliable confidential informer. See *Collins v. State*, 161 Ga. App. 546 (287 SE2d 708) (1982). This case is one involving a tip from a known confidential informer, whose reliability was established. This fact, combined with the corroboration of the information — that Pittman was in a Peugeot and that he was seen speaking with Quinn Mason — in addition to the exigencies of the situation — that the drugs were in the automobile and were going to be distributed — provided an adequate basis for the warrantless search.[1] See generally *McKinney v. State*, 184 Ga. App. 607 (1, 2) (362 SE2d 65) (1987); *Pittman v. State*, 189 Ga. App. 781 (2) (377 SE2d 695) (1989).

8. Pittman claims that the trial court erred in that its charge to the jury regarding intent was incomplete. Although Pittman concedes that the court gave a general instruction regarding intent, he claims that the court failed to instruct the jury that intent to commit the act prohibited by the statute must be proven beyond a reasonable doubt. We find this enumeration without merit and find that the charges regarding intent, when viewed as a whole, were appropriate.

9. In his next enumeration, Pittman argues that the trial court erred by failing to give instructions to the jury regarding its use and consideration of the results of the lie detector test. Although Pittman did not request such an instruction, he argues that in the absence of such instruction, the jury assumed that the test results meant that Pittman was guilty.

This enumeration is without merit. Although Pittman cites *State v. Chambers*, 240 Ga. 76 (239 SE2d 324) (1977), that case does not support his proposition. *Chambers* states that "[w]hen polygraph results are admitted at trial, either party is entitled, *upon request*, to have the jury charged concerning the meaning of this evidence." (Emphasis supplied.) Id. at 80. See *Harris v. State*, 168 Ga. App. 458 (5) (309 SE2d 431) (1983). Here, Pittman submitted no such request and

---

[1] The instant case is distinguishable from cases involving anonymous tipsters. See, e.g., *Alabama v. White*, 496 U. S. 325 (110 SC 2412, 110 LE2d 301) (1990); *State v. Ball*, 207 Ga. App. 729 (429 SE2d 258) (1993); *Moreland v. State*, 204 Ga. App. 218 (418 SE2d 788) (1992); *State v. Smalls*, 203 Ga. App. 283 (416 SE2d 531) (1992).

it was not error for the court to fail to give this charge. *Smith v. State*, 258 Ga. 676 (3) (373 SE2d 200) (1988). Further, our review of the record shows that the jury was charged during the expert's testimony regarding the polygraph evidence.

10. Next, Pittman claims that the trial court erred in admitting into evidence the written report of the polygraph examiner. We find this enumeration without merit.

Pittman stipulated to the admissibility of the polygraph examinations. That stipulation stated that he agreed to take the polygraph relating to the charge of possession of cocaine with intent to distribute. The agreement then provided that Pittman "agrees and stipulates that the results may be admitted into evidence at any trial . . . whatever the results are."

At trial, the administrator of the polygraph tests was qualified as an expert and testified. He stated that on March 18, he administered the polygraph, comprised of ten questions, to Pittman three separate times. The next day he retested Pittman, asking him the same set of ten questions, three separate times. Ford explained Pittman's physiological response to the questions, the method by which Pittman's responses were measured and his conclusion regarding the truthfulness of Pittman's responses. Ford's conclusion was that Pittman's responses to the critical issue questions had been deceptive.

Introduced as evidence were two graphs of the three tests on which Pittman's physiological responses were recorded. One graph recorded Pittman's results of March 18 and the other recorded his March 19 responses. The graphs provided an explanation of Pittman's responses. Sets of Ford's notes, which contained the questions asked Pittman, were also introduced as exhibits.

Two reports were admitted into evidence which listed the relevant questions asked and Pittman's responses. At the bottom of the reports was the conclusion that Pittman had been untruthful. The statement says: "[b]ased on the presence of physiological reactions on the polygrams which indicate deception on the relevant issue questions [there were three relevant questions], it is the opinion of the examiner that the examinee was not truthful." Pursuant to Pittman's objection the trial court instructed that the word "opinion" be stricken on both reports. Thus, that portion of the statement read: "it is the _____ of the examiner that the examinee was not truthful."

At trial, Pittman did not object to the two reports as such being sent out with the jury. He objected only to the portion which gave the examiner's opinion. He distinguished between the *results* of the two tests (tests were identical and given on two days) and the opinion of the examiner based on those results. He did not object to the results being shown.

The ground upon which Pittman objected to the opinion of the

examiner being shown was that it was the jury's province to form an opinion as to the results, not the examiner's. However, the examiner, who had qualified as an expert, had testified to his opinion repeatedly during direct and cross-examination, and that is not enumerated as error. As stated above, the word "opinion" was redacted from both exhibits, but defendant still objected because he wanted the whole clause redacted.

Now on appeal, Pittman urges that the exhibits should not have been sent out because they constituted "surplusage and improper written testimony," i.e., repetition of testimony in the jury room. He cites *Harris*, supra, which held that the documentation of the expert's opinion, to which the expert had testified, could not be submitted to the jury because it constituted the witness speaking to the jury more than once. This is clearly a different ground than was urged below, one that the trial court had no opportunity to address. Thus it is not properly before us. See *Herrin v. State*, 230 Ga. 476 (1) (197 SE2d 734) (1973).

Moreover, if it was error not to redact the whole clause, which is what Pittman wanted below, it surely was harmless because he did not object to the test *results* being sent out in writing, which showed "deception," and there was no doubt from the testimony what the examiner's opinion was. The court fully instructed the jury on its duty to determine the credibility of witnesses and that it was not bound by the testimony of an expert, including the expert's opinion, but rather that it was to be given only such weight as the jury thought proper. It is " 'highly probable that the error [if there was such] did not contribute to the judgment. . . .' [Cits.]" *Brewton v. State*, 174 Ga. App. 109, 111 (329 SE2d 270) (1985).

11. Pittman claims that the trial court erred in allowing the jury to disperse during the course of their deliberations without giving appropriate instructions not to discuss the case pursuant to OCGA § 15-12-142 (a). Pretermitting the fact that the court had thus instructed the jury twice and the fact that Pittman has demonstrated no harm as a result of this claimed error, we find that Pittman has waived his right to complain of this by failing to raise it below. Because Pittman did not raise this point at the time of the trial, nor in his motion for new trial nor in his amended motion for new trial, he is barred from raising it for the first time here. See *Banks v. State*, 201 Ga. App. 266, 269 (3) (410 SE2d 818) (1991).

*Judgment affirmed. Birdsong, P. J., and Beasley, J., concur.*

DECIDED MARCH 17, 1993 —
RECONSIDERATION DENIED MARCH 30, 1993

*Mathis, Sands, Jordan & Adams, Virgil L. Adams*, for appellant.
*Willis B. Sparks III, District Attorney, Vernon R. Beinke, Howard Z. Simms, Assistant District Attorneys*, for appellee.