A98A1649. GARMON v. THE STATE.
(510 SE2d 350)

POPE, Presiding Judge.

Following a bench trial, the trial court convicted Sammy Garmon of trafficking in methamphetamine. Garmon appeals, challenging the denial of his motion to suppress evidence of the methamphetamine and the sufficiency of the evidence supporting his conviction. We conclude that the court properly denied Garmon's motion to suppress, that the evidence was sufficient to convict, and we affirm.

1. As grounds for his motion to suppress, Garmon asserted that police obtained evidence of the methamphetamine following an arrest not supported by probable cause. In addressing this assertion, we construe the evidence in the light most favorable to the trial court's decision. Sawyer v. State, 227 Ga. App. 493, 494 (2) (489 SE2d 518) (1997).

Viewed in this light, the evidence reveals that in July 1995, a Douglas County Jail inmate informed Investigator Mike Howell of the Douglas County Sheriff's Department that a man called "Speed" had sold methamphetamine to another individual. The informant told Howell he believed "Speed's" real name was Sammy Garmon and that he drove a black Chevrolet truck. Howell testified that after investigating the information, he also learned that Garmon "may be an acquaintance" of another individual who purportedly was a methamphetamine dealer.

Howell investigated the information and, in August 1995, obtained a photograph of Garmon from police files relating to a prior driving under the influence arrest. In mid-August, Howell and another investigator saw the black Chevrolet truck registered to Garmon outside a pool hall. The investigators entered the pool hall where they observed Garmon conduct what appeared to be a hand-to-hand drug transaction. The investigators did not further explore the apparent transaction, however, and according to Howell his investigation of Garmon ceased a short time later.

In an unrelated investigation into an illegal sports betting operation, Howell obtained a wiretap warrant to monitor phone calls made to the residence of an individual named Michael Wilson. During the wiretap investigation, which began on December 20, 1995, the officers overheard conversations which indicated a person named "Sammy" was participating in illegal gambling and narcotics activity. Howell testified regarding the specifics of several conversations which involved "Sammy's" drug and gambling activities. Specifically, on one occasion an individual called the house asking if Wilson had any "white stuff," and Wilson responded that "he would have to wait until Sammy called him back." During approximately three other phone calls, the speakers stated that Sammy had won or lost a certain amount of money.

On December 29, Howell obtained a search warrant for Wilson's house to obtain evidence of crimes involving gambling and controlled substances, specifically documents, records, notes, recordings, controlled substances, U. S. currency, and telephone billing records. In the six-page affidavit attached to the warrant, Howell detailed the mechanics of the gambling operation, the details of which he had learned through monitoring phone calls to Wilson's residence. The affidavit listed several individuals who were involved in the sports betting operation and detailed the volume of activity — 9,000 calls in a two-month period — as well as other signs of gambling activity which Howell had observed. Howell's affidavit also stated that he believed "controlled substances may be found as well because during monitored conversations Wilson has stated that he enjoys consuming marijuana." Howell stated that he believed "that such information will be presently located at the above residence because this weekend there are going to be several professional and college football games to be played between now and 1/2/96." Howell's affidavit set forth the need for a "no-knock" warrant; he explained that "[i]n a case such as this, documents and records are easily and quickly destroyed by means of fire. Sometimes gambling records are kept on special paper that burns easily, based on what Affiant has been told by other officers experienced in such investigations. Items can be flushed down the toilet."

On December 30, a couple of days before Garmon's arrest, the Douglas County Sheriff's Department set up a surveillance on Michael Wilson's residence and observed a truck parked in Wilson's driveway. When officers ran the tag on the truck, they learned it was registered to a man who sold methamphetamine.

The officers' plan was to execute the search warrant on the evening of January 2, 1996. The raid was planned to coincide with the National Championship Football Game, one of the largest betting games of the year, which was also scheduled for that night. At about

8:15 p.m. on January 2, before the search warrant was executed, the officers were monitoring the wiretap on Wilson's phone and overheard a conversation between "Sammy" and "Dan" in which the men were talking about gambling and drugs. The officers had previously received information from the IRS that "Sammy" was Sammy Joe Garmon and "Dan" was Dan Boone. According to Howell, in the January 2 phone conversation "Sammy" and "Dan" made a side bet. About ten minutes after hearing that conversation, Howell arrived at Wilson's residence and set up surveillance on Wilson's home. Three to five minutes after Howell got to Wilson's residence, he saw an unidentified man (later identified as Garmon) and woman leave the house and get into a pickup truck.

Howell testified that "[d]ue to the fact that they were in the process of getting everybody together to do the search warrant execution, we were stopping the vehicles that were leaving the house." Accordingly, Howell instructed another investigator, Deputy Bearden, to follow the man and woman, perform a "traffic stop" on the vehicle, and detain its occupants. Bearden began following the car, but because Bearden was in an undercover car, it was necessary for him to call for a patrol car to actually stop the truck. The truck was stopped approximately two miles from Wilson's home, and Bearden approached the vehicle. Upon approaching the pickup truck, Bearden noticed that the driver's "eyes were very glassy, and his speech was slurred." Bearden did not smell any alcohol and suspected that the driver was under the influence of drugs. Bearden testified, however, that the driver was not speeding or weaving and that he was not investigating the driver for driving under the influence. Bearden asked the driver for a license and insurance card, both of which identified the driver as Sammy Garmon. When Bearden notified Howell that Garmon was the driver, Howell responded that he "had information on [Garmon] that [Garmon] was a meth dealer, and [Bearden] needed to check him pretty close."

Following Bearden's conversation with Howell, Bearden asked Garmon if he would give consent to a search of the vehicle. Although Garmon initially said "yes," he immediately changed his answer to "no." Bearden then called a canine unit to perform a "free air search around the vehicle." While they were waiting for the canine unit, Bearden patted down Garmon for safety reasons. During his patdown, Bearden discovered what appeared to be two gambling sheets in Garmon's left back pocket, $8,417 in his right front pocket, along with a knife or some knives.

Approximately five minutes later the canine unit arrived, and after walking around the pickup truck, the dog signaled the possible presence of drugs near the driver's side door. The dog's handler then opened the passenger side door, and the dog alerted on a tissue box

located on the passenger side floorboard. The officers looked in the box and found a rocky, powdery substance that they suspected was a narcotic. Bearden asked Garmon if the substance was methamphetamine, and Garmon responded affirmatively.

Following the discovery of the methamphetamine, the officers placed Garmon and his female passenger, Patricia Garrett, in the back of a patrol car. Upon searching Garrett's pocketbook, Bearden found a sock containing some loose methamphetamine and syringes.

After being charged with trafficking in methamphetamine, Garmon moved to suppress the evidence obtained following the stop. Here he argues that the court improperly denied the motion to suppress in that: the initial stop by Deputy Bearden was improper and that the officers' subsequent actions in detaining Garmon and having him exit his vehicle were improper. We find that the initial stop by Deputy Bearden was justified; that the officers' subsequent actions were also justified; and that the trial court's denial of the motion to suppress was proper.

"On reviewing a trial court's ruling on a motion to suppress, evidence is construed most favorably to uphold the findings and judgment and the trial court's findings on disputed facts and credibility must be accepted unless clearly erroneous." (Citations and punctuation omitted.) *Fritzius v. State*, 225 Ga. App. 642, 644 (484 SE2d 743) (1997).

Although we were unable to locate Georgia cases which involved identical facts, several cases guide our inquiry into the validity of the warrantless search here. *Michigan v. Summers*, 452 U. S. 692 (101 SC 2587, 69 LE2d 340) (1981), arose after police officers, who were about to execute a search warrant on a house, saw the resident of the house, Summers, leaving the premises. The officers detained Summers during the search and, after finding contraband in the house, arrested him. During a search of Summers' person, the officers found additional contraband. Summers moved to suppress evidence of the contraband found on his person, arguing that the detention and search violated his Fourth Amendment rights. Although the trial court agreed and suppressed the evidence, the United States Supreme Court reversed, concluding that the officers were permitted to detain Summers while they searched his home.

In concluding that the detention was justified, the Supreme Court stated that their assessment focused on both the law enforcement interest and the nature of the articulable facts supporting the detention. The court stated that the legitimate law enforcement interest in preventing flight, the interest in minimizing the risk of harm to officers, and the interest in preventing destruction of evidence were among the law enforcement interests at issue. *Michigan v. Summers*, 452 U. S. 702-703. The Supreme Court then discussed

the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant, stating: *"[t]he existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. . . .* The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." (Emphasis supplied.) Id. at 703-704.

In *Fritzius v. State*, 225 Ga. App. 642, the validity of a warrantless search in light of a warrant which had been issued for a home was also at issue. In *Fritzius*, a police narcotics unit was preparing to execute a search warrant for drug violations on a mobile home occupied by a man named Henry Fallaw. As the warrant was about to be executed, an officer observed two men leave the home, enter a vehicle and drive away. An officer was instructed to stop the vehicle and "find out if Fallaw, who was named in the warrant, was in the car." Id. at 644. Accordingly, the officer stopped the vehicle approximately two miles away from the home and subsequently discovered contraband in the car. Fallaw was the driver of the car. Fritzius, the passenger and the vehicle owner, moved to suppress evidence of the contraband on the ground that it was the fruit of an unlawful stop. The trial court denied Fritzius' motion to suppress the evidence, and this Court affirmed.

Citing *Michigan v. Summers*, 452 U. S. 692, the *Fritzius* court stated: "[w]hen a person is leaving a premises which is about to be searched pursuant to a warrant, a brief, momentary detention by law enforcement personnel is permitted when supported by articulable suspicion or probable cause." *Fritzius v. State*, 225 Ga. App. at 644. The court analyzed *Summers*, applied it to the facts of the case, and stated: "[i]n determining whether a search or seizure is constitutionally prohibited, the ultimate test for the validity of the police's conduct is whether, under the circumstances then confronting the police, their conduct was reasonable within the meaning of the Fourth Amendment. It would appear reasonable within the meaning of the Fourth and Fourteenth Amendments for a police officer, knowing that certain persons and premises were the subject of the immediate execution of a search warrant, to detain temporarily a vehicle containing occupants who had just departed the premises to be searched in order to identify the occupants and to see if one of them was a person named in the warrant. Under such circumstances, the detention would be minimally intrusive and neither an arbitrary nor capricious exercise of police power." (Citations, punctuation and emphasis omitted.) Id. at 646.

Also relevant to our inquiry is *Terry v. Ohio*, 392 U. S. 1, 23 (88 SC 1868, 20 LE2d 889) (1968), which focuses on the "articulable suspicion" element of the inquiry which was discussed in *Michigan v. Summers*. In *Terry*, the court stated: "[m]omentary detention and questioning are permissible if based upon specific and articulable facts, which, taken together with rational inferences from those facts, justify a reasonable scope of inquiry not based on mere inclination, caprice or harassment. An authorized officer may stop an automobile and conduct a limited investigative inquiry of its occupants, without probable cause, if he has reasonable grounds for such action — a founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing." (Citations and punctuation omitted.) *Fritzius v. State*, 225 Ga. App. at 643.

In the instant case, it was reasonable within the meaning of the Fourth and Fourteenth Amendments for the officers, knowing that Wilson's premises were to be the subject of the immediate execution of a search warrant, to detain temporarily the vehicle containing Garmon in order to identify the occupants and see if one of them was the person they had just overheard discussing gambling and drugs on the phone. In light of the fact that the warrant was issued for January 2 — specifically because of the volume of gambling that would occur on that day, it was reasonable to follow the car from the house. Under such circumstances, the detention was minimally intrusive and was neither an arbitrary nor capricious exercise of police power. See *Bales v. State*, 216 Ga. App. 856 (456 SE2d 112) (1995); *Setser v. State*, 209 Ga. App. 57, 58 (1) (432 SE2d 652) (1993); compare *State v. Crank*, 212 Ga. App. 246, 249 (441 SE2d 531) (1994). Both the law enforcement interest in preventing the destruction of evidence and the nature of the articulable facts supporting the detention establish that the stop was proper.

The officers' actions subsequent to the stop were also justified. Officer Bearden's pat-down of Garmon was reasonable and justified under the circumstances. See generally *Davis v. State*, 232 Ga. App. 450, 451 (501 SE2d 241) (1998). Additionally, the "free air search" was supported by articulable suspicion: Garmon had just left Wilson's residence, and once Bearden ascertained Garmon's identity, the earlier investigation of Garmon's involvement in methamphetamine gave the officer additional reasonable articulable suspicion. See *Pitts v. State*, 221 Ga. App. 309, 311 (2) (471 SE2d 270) (1996); *Fritzius v. State*, 225 Ga. App. at 646 ("the existence of an articulable suspicion can be based on the collective knowledge of law enforcement officials" and "the detaining officer was entitled to rely on the information given him by a fellow officer in the formation of an articulable suspicion").

2. Garmon also asserts that notwithstanding any error in the trial court's denial of his motion to suppress, there was insufficient evidence to establish that he possessed the methamphetamine found in his truck. Garmon contends that the evidence showed that his passenger, Patricia Garrett, had equal access to the contraband and that the trial court therefore erred in denying his motion for directed verdict. Again, we disagree.

" 'The equal access rule, entitling a defendant to acquittal where evidence is presented that others had equal access to a vehicle or that the vehicle had recently been used by others, applies only where the *sole evidence* of possession of contraband found in the vehicle is the defendant's ownership or possession of the vehicle.' " (Emphasis in original.) *Pittman v. State,* 208 Ga. App. 211, 214 (2) (430 SE2d 141) (1993).

In the instant case, Garmon's possession of the truck was not the sole evidence that he possessed the methamphetamine found in the vehicle. Rather, evidence showed that Garmon possessed over $8,000 in cash when he was stopped and that he identified the substance as methamphetamine when asked by Deputy Bearden. Under these circumstances, it was for the factfinder to determine whether Garmon possessed the contraband.

*Judgment affirmed. Andrews, C. J., and Eldridge, J., concur. Beasley, J., concurs specially. McMurray, P. J., and Ruffin, J., dissent. Blackburn, J., not participating.*

BEASLEY, Judge, concurring specially.

1. Appellant Garmon is barking up the wrong tree and thereby leading off the track for a proper resolution of his constitutional challenge to the car stop. He would find the prey of success if *Fritzius-Summers*[1] were the proper tree.

I agree with Garmon and the dissenting opinion that the boundaries of reasonableness for police seizures set in *Michigan v. Summers* were exceeded by the police when they stopped Garmon several miles from the residence for which a warrant authorized a search. I did not join in the majority in *Fritzius v. State,* and in this case the facts express no more of a justifiable governmental interest indicating a need for the seizure than they did in *Fritzius.*

In fact, when the stop was made, the police did not know who the two people were or what connection they had with the residence they had just left. The no-knock warrant was for the "residence of Michael Joel Wilson" and "the motor vehicles on said premises . . . being in the possession and control of Michael Joel Wilson," and if any named

---

[1] *Fritzius v. State,* 225 Ga. App. 642 (484 SE2d 743) (1997); *Michigan v. Summers,* 452 U. S. 692 (101 SC 2587, 69 LE2d 340) (1981).

articles were found, they and "Michael Joel Wilson" were to be brought before a judicial officer. Thus, in the first place, the warrant itself did not encompass the seizure distanced from the residence and did not contemplate that the person was Wilson.

Secondly, none of the government interests identified in *Summers* was articulated by the police in this case, none of them appeared from the circumstances, and no others were offered other than that the decision had been made to stop any vehicles which left the house. But why? The question was not answered. The Fourth Amendment was compromised under a *Michigan v. Summers* analysis.

But that is not the end of the hunt for the proper constitutional quarry. Under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), the detention was a permissible vehicle stop.

"Although an officer may conduct a brief investigative stop of a vehicle, such a stop must be justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct[.] [See *Terry v. Ohio*.] Investigative stops of vehicles are analogous to *Terry*-stops, and are invalid if based upon only unparticularized suspicion or hunch. An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. This suspicion need not meet the standard of probable cause, but must be more than mere caprice or a hunch or an inclination."[2] The objective facts must indicate "a founded suspicion . . ., some basis from which the court can determine that the detention was not arbitrary or harassing."[3] Under *Terry*, "a police officer who lacks probable cause may momentarily detain a suspicious individual in order to determine his identity or to maintain the status quo while obtaining more information."[4]

In *Whren v. United States*,[5] the Supreme Court rejected a subjective test to determine reasonableness of a motor vehicle stop under the Fourth Amendment. What is stated by the officers as the reason for the stop is not determinative of its constitutionality.[6] It depends on an evaluation of the objective facts surrounding the stop. Do they

---

[2] (Citations and punctuation omitted.) *Jorgensen v. State*, 207 Ga. App. 545, 546 (428 SE2d 440) (1993).

[3] (Citations and punctuation omitted.) *State v. McFarland*, 201 Ga. App. 495, 496 (411 SE2d 314) (1991).

[4] *State v. Corbett*, 205 Ga. App. 554, 556 (423 SE2d 38) (1992).

[5] 517 U. S. 806 (116 SC 1769, 135 LE2d 89) (1996).

[6] *United States v. McKie*, 951 F2d 399, 402 (II) (D.C. Cir. 1991): "*Terry* requires only that the facts establishing reasonable suspicion be 'articulable' — as opposed to 'inchoate' — not that the officer making the stop precisely and individually articulate the facts that added up to suspicion in his mind. The *Terry* standard being one of objective reasonableness, we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then

give rise to "at least articulable and reasonable suspicion" of criminal conduct so as to justify an investigative stop? If there are "specific, articulable facts sufficient to give rise to" such a suspicion, the stop is valid.[7]

Facts which gave rise to an articulable suspicion of criminal conduct occurring or having just occurred and involving at least the male occupant of the vehicle, who was seen driving, were at least these. The truck was stopped not more than 20 minutes after the police monitored a telephone conversation in which a Sammy and a Dan talked about their gambling and made a side bet. Based on information the police had from the IRS, they believed that Sammy was Sammy Joe Garmon, whom they had seen on a previous occasion at a pool hall conduct what appeared to be a drug sale. The name "Sammy" had come up in several of the telephone conversations monitored earlier in December. On one occasion, the resident of the house about to be searched told a requester of drugs that "he would have to wait until Sammy called him back."

So, when a male person left the house where the gambling transaction had occurred moments earlier, in a truck belonging to a known drug dealer (Billy Joe Kilgore, who sold methamphetamine), the police could have a reasonable belief that he was either Sammy Garmon or Dan, the males who had engaged in the bet. If it was Sammy Garmon, there was a reasonable possibility that he would be in possession of drugs.

It would also be reasonable to believe, alternatively, that it was the owner of the truck, Kilgore, and because of his livelihood and their knowledge that Wilson, the resident of the house, liked drugs, that he possessed drugs in the vehicle or had just completed a drug delivery to Wilson.

Thirdly, considering the ongoing gambling operation that was known via the telephone monitoring, it was reasonable to believe that the persons leaving had information about it or were actually involved in it.

Stopping the vehicle two or three miles from the house rather than at the house was justifiable also. It was not, in this sense, a stale stop. Had the driver seen police closing in on him, he could have alerted the occupants of the house by horn blow or possibly by car phone that the police were on the premises. Much of the evidence of criminal activity which the police were authorized by the search warrant to seize could be quickly and easily destroyed. In addition, if

---

consider whether a reasonable officer in those circumstances would have been suspicious. [Cit.]"

[7] *Delaware v. Prouse,* 440 U. S. 648, 663 (99 SC 1391, 59 LE2d 660) (1979); *Johnson v. State,* 230 Ga. App. 535, 537 (1) (496 SE2d 785) (1998); *United States v. McKie,* supra.

police approached the truck while it was still visible from the house, this activity would have informed the occupant to police presence and allowed frustration of the search warrant's execution. Even signaling the car to stop somewhere close to the house would not have allowed enough time for the other officers to announce their presence at the door with the warrant and secure the house for the search. A premature police car presence and activated blue light in the truck occupants' view would have allowed the truck occupants to make a car phone call to the house before the police were ready to announce their presence. It would be reasonable to suspect that persons engaged in gambling or drug transactions might have a car phone.

Based on these objective facts, there was at least an articulable suspicion which warranted the stop and investigatory detention. The trial court is properly affirmed in this regard.

2. As to Division 2 of the majority opinion, I fully concur.

RUFFIN, Judge, dissenting.

Because I believe that the stop of Garmon's vehicle was improper, I respectfully dissent.

Neither *Michigan v. Summers*, 452 U. S. 692 (101 SC 2587, 69 LE2d 340) (1981), nor *Fritzius v. State*, 225 Ga. App. 642 (484 SE2d 743) (1997), cited by the majority, supports the stop in this case. In *Summers*, police officers were about to execute a search warrant on a house when they encountered and detained its resident, Summers, leaving the premises. The officers detained Summers during the search and, after finding contraband in the house, arrested him. During a search of Summers' person, the officers found additional contraband. Summers moved to suppress evidence of the contraband found on his person because it resulted from a detention which violated his Fourth Amendment rights. Although the trial court agreed and suppressed the evidence, the United States Supreme Court reversed, concluding that the officers were permitted to detain Summers while they searched his home.

In addressing the propriety of the detention, the Supreme Court found that the resulting intrusion on Summers' privacy and restraint on his liberty were less severe than that caused by the search of *his home. Summers*, supra at 701. In this regard, the Court reasoned that the premises search was a "substantial invasion of the privacy of the *persons who resided there* . . . [and that most citizens] would elect to remain in order to observe the search of *their possessions*." (Emphasis supplied.) Id. at 701. In addition, the Court found the detention justified because law enforcement officials have a legitimate interest in preventing flight if contraband is found during the search. Id. at 702. The Court further justified the detention on the ground that "the orderly completion of the search may be facilitated

if *the occupants of the premises* are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." (Emphasis supplied.) Id. at 703.

It is clear from *Summers* that, in approving the detention of Summers, the Court relied exclusively on reasons dependent upon his residence in the home. Because Summers lived in the home that was being searched, the intrusions on his privacy and liberty interests were less objectionable, the officers could prevent his flight if contraband was found and he could facilitate the officers' search and minimize any unnecessary intrusion.

We recently applied these same factors in approving a vehicle stop in *Fritzius*, supra. In *Fritzius*, police were about to execute a search warrant on a mobile home occupied by a man named Henry Fallaw when an officer observed two men leave the home, enter a vehicle and drive away. An officer was instructed to stop the vehicle and "find out if Fallaw, who was named in the warrant, was in the car." Id. at 644. In accordance with these instructions, an officer stopped the vehicle approximately two miles away from the home and subsequently discovered contraband in the car. Fritzius, the vehicle owner, moved to suppress evidence of the contraband on the ground that it was the fruit of an unlawful stop. The trial court denied Fritzius' motion to suppress the evidence, and on appeal, this Court affirmed.

The *Fritzius* majority reasoned that if the Court in *Summers* allowed police to detain the resident at the premises, then police could similarly stop a car two miles away from the premises and determine if the owner was present in the vehicle. The *Fritzius* majority reasoned that: "It would appear reasonable within the meaning of the Fourth and Fourteenth Amendments for a police officer, knowing that certain persons and premises were the subject of the immediate execution of a search warrant, to detain temporarily a vehicle containing occupants who had just departed the premises to be searched *in order to identify the occupants and to see if one of them was a person named in the warrant.* Under such circumstances, the detention would be minimally intrusive and neither an arbitrary nor capricious exercise of police power." (Emphasis supplied and omitted.) Id. at 646.

Neither *Summers* nor *Fritzius* authorized the stop of Garmon's vehicle in the present case. The evidence is clear that Garmon neither resided in the premises being searched nor was he stopped immediately outside the premises as was the defendant in *Summers*. And, unlike *Fritzius*, where the officer stopped the car for the sole and specific purpose of identifying the occupants to see if one of them was named in the warrant, the evidence in this case clearly estab-

lished that Deputy Bearden was instructed to stop the vehicle and detain its occupants, *without regard to whether one of the occupants was the homeowner, Wilson.*

Because Garmon did not reside in the premises being searched, his detention resulted in a substantial intrusion into his privacy and liberty interests. Indeed, Garmon was not named in the warrant, there is no evidence he had any interest in the contents of the home being searched and there appears no reason why he would elect to be present during the search of the home. See *Summers*, supra at 701. Furthermore, assuming contraband was found in the home, Garmon's previous mere presence in the residence would have been insufficient to attribute possession of the contraband to him and the risk of his flight would thus not have been a factor. See *Williams v. State*, 207 Ga. App. 782, 784 (4) (429 SE2d 153) (1993); *Summers*, supra at 702. Finally, because Garmon did not reside there, he could not facilitate the officers' search, and accordingly had no interest in assisting the officers in this regard. See id. at 703. Because there existed no valid justification for stopping Garmon's automobile, I would find the stop unreasonable and reverse his conviction.

I am authorized to state that Presiding Judge McMurray joins in this dissent.

DECIDED DECEMBER 4, 1998 ▮▮▮▮▮▮▮

*Mark J. Kadish, Rhonda L. Byers*, for appellant.
*David McDade, District Attorney, William H. McClain, Assistant District Attorney*, for appellee.